## THE STANDARD ACCIDENT AND LIFE INSURANCE COMPANY OF DETROIT, MICHIGAN, *vs.* RUTH M. WOOD.

*Accident insurance policies: cause of death; effect of disease; testimony of physicians; general health; embalming fluid. Warranties; untrue; questions of materiality. Prayers; taking case from jury. Experts; facts in case not all proved prior to their testimony. Witness; examination; answers, inferences; words of confidence merely.*

It was sought to prove by experts that an embalming fluid would not have a certain effect on the arteries of a deceased person; it was held that evidence as to the fluid then in use was not admissible, unless it were shown to be of the same composition as the actual fluid used on the occasion in question, some ten years before.                                                      p. 596

Where an accident policy insures against "bodily injuries effected directly and independently of all other causes, through external, accidental and violent means," a prayer asserting that it appears from the "uncontradicted evidence that death did not result directly and independently of all other causes from such injuries. can not be granted unless the evidence on that point is absolute and uncontradicted.
                                                      p. 588

Where the medical testimony differs as to whether the death resulted solely and directly from the accident or whether

disease was a contributing cause, the question is for the jury to determine upon the weight of all the evidence. ·    p. 592

A prayer asking that the jury be instructed that under the pleadings there is no evidence legally sufficient to entitle the plaintiff to recover. and that their verdict must be for the defendant, can not be granted if there is any evidence, however slight, tendering to support the plaintiff's case.    p. 588

A physician who frequently sees a man socially is a competent witness to prove the condition of his general health.

p. 593

A witness, a physician. was asked whether a decedent's heart had been examined before the anaesthetic was administered, replied: "Yes. I am satisfied that the doctor examined his heart;" a motion was made to strike out the testimony on the ground that it stated an inference only; held that the answer was specific, "yes." and that the added words merely expressed confidence.    p. 594

A renewal of an insurance policy does not introduce either a new contract or a new cause of action, it merely prevents the lapse of the policy and extends its life.    p. 594 .

Expert witnesses may base their opinion on facts only, of which there is evidence in the case.    p. 595

But the admission of an expert's testimony does not present reversible error merely because a fact upon which he based his opinion had not been put in evidence at the time he testified., when it had been stated to him in the history of the case and was subsequently proved in the case by proper evidence.    p. 595

The better course would have been to have obtained leave of the Court for suspending the examination of the expert when the objection was made and to have then proved the fact referred to.    p. 595

In a suit upon such a policy a prayer is erroneous which seeks to have the jury instructed that the burden is upon the plaintiff to establish by a preponderance of testimony that the accident, independently of all other causes, produced the death; thus practically eliminating from the jury's con-

sideration of any presumption to that effect or of anything but affirmative proof.                                      p. 597

A prayer in a suit upon a life insurance policy, is erroneous if it leaves to the jury to find for the defendant if they find that the warranties mentioned therein are untrue without being required to find that such warranties were material.
                                                                    p. 597

It is only in exceptional cases that the question of the materiality of such warranties can be withdrawn from the jury as when the evidence is unconditional.                ` p. 597

*Decided November 24th, 1911.*

Appeal from the Baltimore City Court (DOBLER, J.).

The cause was argued before BOYD, C. J., PEARCE, BURKE, URNER and STOCKBRIDGE, JJ.

*Clarence A. Tucker* and *Joseph N. Ulman* (with whom were *Sam'l. J. Harman* and *Chas. H. Knapp* on the brief), for the appellant.

*Alexander Preston,* for the appellee.

The following are the prayers that were offered by the plaintiff and defendant respectively; the action of the Court thereon being as indicated upon the respective prayers:

*Plaintiff's Prayer.*—The plaintiff prays the Court to instruct the jury, that if they find a verdict for the plaintiff, that the measure of damage shall be the sum of fifty-five hundred dollars ($5,500); and the jury, in their discretion, may allow the interest on the said sum from May 16th, 1909. (*Granted.*)

*Defendant's 1st Prayer.*—The defendant prays the Court to instruct the jury that under the pleadings there is no evidence legally sufficient to entitle the plaintiff to recover and therefore, their verdict must be for the defendant. (*Refused.*)

*Defendant's 2nd Prayer.*—The defendant prays the Court to instruct the jury that it appears from the uncontradicted evidence that the death of the deceased did not result directly and independently of all other causes from bodily injuries sustained through external, violent and accidental means, and, therefore, under the pleadings their verdict must be for the defendant. (*Refused.*)

*Defendant's 3rd Prayer.*—The defendant prays the Court to instruct the jury that as it appears from the uncontradicted evidence that the deceased at the time of the date of the policy and renewal thereof warranted that he was in sound condition, mentally and physically, and that in fact the deceased was not in sound condition, mentally and physically at the time of the date of the policy and renewal thereof, and further that such breach of warranty is a matter material to the risk, and, therefore, under the pleadings their verdict must be for the defendant. (*Refused.*)

*Defendant's 4th Prayer.*—The defendant prays the Court to instruct the jury that as it appears from the uncontradicted evidence that the deceased at the time of the renewal of the policy filed as the cause of action in this case warranted that he was in sound condition, mentally and physically, and that the hazard in writing said risk was no greater than or different from that of the hazard at the date of the policy, and that in fact the deceased was not in sound condition, mentally and physically, at the time of said renewal and the hazard was greater and different from that of the hazard at the date of the policy, and further that such breach of warranty was a matter material to the risk, and, therefore, under the pleadings their verdict must be for the defendant. (*Refused.*)

*Defendant's 5th Prayer.*—The defendant prays the Court to instruct the jury that a bodily injury is anything which works harm to or impairs the physical parts, and is to be distinguished from the event causing the injury; that this event may be either disease, or accident, or both, and that by the true construction of the policy offered in the evidence

in this case, the only bodily injuries insured against are those which are effected directly and independently of all other causes through external, accidental and violent means and if they are effected through any other event, either in whole or in part, the policy according to its plain provisions, does not cover the case,—that is to say, the injury which is within the policy must be traceable exclusively to an accident, and as it appears from the uncontradicted evidence that disease was at least a contributing factor to the death of deceased, their verdict under the pleadings must be for the defendant. (*Refused.*)

*Defendant's 6th Prayer.*—The Court instructs the jury that there is no presumption that the death of Rufus K. Wood resulted from the accident which he sustained on or about the 2nd day of May, 1909, (if the jury find he sustained such accident), and the burden of proof rests upon the plaintiff to establish by a preponderance of testimony that the said accident directly and independently of all other causes produced the death of the said Rufus K. Wood on the 16th day of May, 1909. (*Granted.*)

*Defendant's 7th Prayer.*—The Court instructs the jury that by the true construction of the policy offered in evidence in this case, before they can find a verdict in favor of the plaintiff they must find that the death of Rufus K. Wood resulted solely from bodily injuries effected through external, violent and accidental means directly and independently of all other causes; and if the jury find that certain organs in the body of the said Rufus K. Wood were in a diseased condition, and that that condition was a contributing cause to his death, then even though the jury may find that the accident aggravated that condition, and that but for the accident he might not have died, when and as he did die, their verdict should nevertheless be for the defendant. (*Granted.*)

*Defendant's 8th Prayer.*—The defendant prays the Court to instruct the jury that a bodily injury is anything which works harm to or impairs the physical parts, and is to be

distinguished from the event causing the injury; that this event may be either disease, or accident, or both, and that by the true construction of the policy offered in the evidence in this case, the only bodily injuries insured against are those which are effected directly and independently of all other causes through external, accidental and violent means, and if the jury find that death did result through any other event, either in whole or in part, the policy according to its plain provisions does not cover the case, and their verdict must be for the defendant. (*Granted.*)

*Defendant's 9th Prayer.*—The defendant prays the Court to instruct the jury that a bodily injury is anything which works harm to or impairs the physical parts, and is to be distinguished from the events causing the injury; that this event may be either disease, or accident, or both, and that by the true construction of the policy offered in the evidence in this case, the only bodily injuries insured against are those which are effected directly and independently of all other causes through external, accidental and violent means, and if they are effected through any other event, either in whole or in part, the policy according to its plain provisions does not cover the case,—that is to say, the injury which is within the policy must be traceable exclusively to an accident, and if the jury find that the organs or other physical parts of the said Rufus K. Wood, or any of them were in a diseased or infirm condition, and that condition contributed to his death, then even though the jury may find that the accident testified to in the case aggravated that condition, nevertheless unless it was also the sole producing cause of that condition, their verdict should be for the defendant. (*Granted.*)

*Defendant's 10th Prayer.*—The Court instructs the jury that there is no evidence in this case legally sufficient to show that the diseased or infirm condition (if the jury find such condition) of the heart, arteries, and other physical parts of the said Rufus K. Wood testified to by the physicians, Drs. Cone and Holland, were caused or produced by the accident

alleged to have been sustained by the said Rufus K. Wood
on the 2nd day of May, 1909. (*Granted.*)

*Defendant's 11th Prayer.*—The Court instructs the jury
that there is no presumption that the death of Rufus K.
Wood resulted from the accident which he is alleged to have
sustained on or about the 2nd day of May, 1909 (if the
jury find he sustained such accident), and the burden of
proof rests upon the plaintiff to establish by a preponderance
of testimony that the said accident directly and independ-
ently of all other causes produced the death of the said Rufus
K. Wood on the 16th day of May, 1909, and if the jury find
that certain organs or other physical parts of the body of the
said Rufus K. Wood were in a diseased or infirm condition
at the time when he met with said alleged accident, and that
condition contributed to his unfortunate death, then their
verdict must be for the defendant. (*Refused.*)

*Defendant's 12th Prayer.*—If the jury find that the death
of Rufus K. Wood was caused partly by the accident, and
partly by a pre-existing diseased condition of some physical
organ of the deceased, or other bodily infirmities (if the jury
find such diseased condition or other bodily infirmity), then
their verdict must be for the defendant. (*Granted.*)

*Defendant's 13th Prayer.*—The Court instructs the jury
that according to the undisputed evidence in this case, the
deceased Rufus K. Wood at the time the policy of insurance
mentioned in the evidence was issued to him in May, 1907,
and also at the time of its renewal in May, 1908, warranted
among other things that he was free from any infirmity,
defect or disease, whether mental or physical, and if the
jury find that the said Rufus K. Wood was not free from
any infirmity, disease, or defect, whether mental or physical,
either in May, 1907, or in May, 1908, when the policy was
renewed, then even though the said Rufus K. Wood made
such representations in good faith, believing at the time that
they were true, yet nevertheless if the jury find that they
were not in fact true, then their verdict should be for the
defendant. (*Refused.*)

*Defendant's 14th Prayer.*—The Court instructs the jury that according to the undisputed evidence in this case, the deceased Rufus K. Wood at the time the policy of insurance mentioned in the evidence was issued to him in May, 1907, and also at the time of its renewal in May, 1908, warranted among other things that he was free from any infirmity, defect or disease, whether mental or physical, and if the jury find that the said Rufus K. Wood was not free from any infirmity, defect or disease, whether mental or physical, either in May, 1907, or in May, 1908, when the policy was renewed, then even though the said Rufus K. Wood made such representations in good faith, believing at the time that they were true, then if the jury find that such representations related to a matter material to the risk, their verdict should be for the defendant. (*Granted.*)

*Defendant's 15th Prayer.*—The Court instructs the jury that according to the undisputed evidence in this case, the deceased Rufus K. Wood at the time the policy of insurance mentioned in the evidence was issued to him in May, 1907, and also at the time of its renewal in May, 1908, warranted among other things that he was free from any infirmity, defect or disease, whether mental or physical, and if the jury find that the said Rufus K. Wood was not free from any infirmity, defect or disease, whether mental or physical, either in May, 1907, or in May, 1908, when the policy was renewed, then even though the said Rufus K. Wood made such representations in good faith, believing at the time that they were true, and shall further find that the defendant issued said policy in May, 1907, or renewed the same in May, 1908, relying upon said representation, and that if the defendant had known that the said Rufus K. Wood's heart, arteries or other organs were in a diseased condition (if the jury find that they were in a diseased condition at the time when said representations were made either in May, 1907, or in May, 1908), the policy would not have been issued in

May, 1907, or would not have been renewed in May, 1908, then the verdict of the jury should be for the defendant. (*Granted.*)

*Defendant's 16th Prayer.*—The Court instructs the jury that according to the uncontradicted evidence in this case the percentage of formaldehyde in the embalming fluid used upon the body of the late Rufus K. Wood was less than four and one-half per cent., and that therefore, they are to disregard all evidence as to the effect upon organs or parts of organs of an embalming fluid containing a larger percentage of formaldehyde. (*Refused.*)

*Defendant's 17th Prayer.*—The Court instructs the jury that according to the uncontradicted evidence in this case the percentage of formaldehyde in the embalming fluid used upon the body of the late Rufus K. Wood was less than four and one-half per cent., and that therefore, they are to disregard all evidence as to the effect upon organs or parts of organs, of an embalming fluid containing a larger percentage of formaldehyde; and the jury are further instructed that according to the uncontradicted evidence in this case, the embalming fluid used upon the body of the late Rufus K. Wood had no effect upon his organs and especially upon his blood vessels other than to stiffen them slightly, and the jury are further instructed that according to the uncontradicted evidence in this case, such embalming fluid did not change the character of said organs and did not produce or tend to produce the calcareous or stony deposits in the walls of the blood vessels, and especially in the walls of the coronary artery of the said Rufus K. Wood, as exhibited in the walls of said blood vessels, if the jury so find. (*Refused.*)

*Defendant's 18th Prayer.*—The Court instructs the jury that there is no evidence in this case legally sufficient to show that the embalming fluid which was injected into the body of the deceased, Rufus K. Wood, affected the heart, arteries, kidneys, or other physical parts of the body in such a way as to cause any contraction or shrinking of same. (*Granted.*)

JUDGE PEARCE delivered the opinion of the Court.

On May 19th, 1907, the Standard Life and Accident Insurance Company of Detroit, issued to Rufus K. Wood an accident policy insuring him against "bodily injuries effected, directly and independently of all other causes, through external, accidental and violent means," and therein promised in consideration of the payment in advance of the initial and renewal premiums in said policy, to pay to Ruth M. Wood, wife of said Rufus K. Wood, the sum of five thousand dollars in event of injuries as above stated, resulting in the death of said Rufus K. Wood, together with such accumulations as should accrue on said policy, amounting under the terms of said policy to the sum of $500, and this policy was renewed for one year from May 19th, 1908, by the payment in advance, of the annual premium thereon.

On May 2nd, 1909, while Mr. Wood and his wife were on a sailing party on the Patapsco River, in a small yacht, a violent storm arose, and Mr. Wood was struck by the boom of a sail, breaking his leg in three places near the ankle, fracturing the leg so badly that it was bent at right angles. It was nearly an hour before the yacht could be brought to the landing when Mr. Wood was carried to his home, at Sparrows Point, where he received attention from Dr. Robert W. Johnson, the chief surgeon, and Dr. John S. Woodward, the resident surgeon of the Maryland Steel Company, at Sparrows Point, of which company Mr. Wood was the general manager. On the same afternoon, May 2nd, 1909, these two surgeons gave him an anaesthetic, chloroform, to relieve the pain and set the leg *temporarily,* until the swelling should be reduced. They first examined his heart, and found nothing abnormal, nothing to contra-indicate the use of chloroform; the temporary splint was removed May 12 and an attempt was made, without an anaesthetic, to apply a plaster splint, but this was not satisfactory, and on May 16th the leg was permanently set, using chloroform as an anaesthetic. This was concluded about noon, when Dr. Johnson returned

to Baltimore, and Mr. Wood died the same afternoon between one and two o'clock. Mrs. Wood testified that about an hour after the final setting of the leg, as directed by the surgeons, he was given nourishment; that he raised his head as much as she would allow him, "and that was the end." Sarah Lynch, a domestic, testified that when the nourishment was given him by Mrs. Wood he raised himself on both elbows when the end came as Mrs. Wood described it.

Mr. Wood was 60 years of age when he died, and had been at the head of the works at Sparrows Point from their organization, about 24 years. The evidence was that he was a small man of compact frame, a man of great activity and energy, a hard and unwearied worker, devoting about twelve hours a day generally to his duties, and often working at night until 11 or 12 o'clock; that his health had always been good, and he was "looked upon as a pine knot."

The first and second pleas to the declaration were never promised as alleged, and never indebted as alleged.

The third and fourth pleas alleged a breach of warranty in the application of the deceased and in the policy, that he was at the time of making the same free from mental or physical infirmity, defect or disease.

The fifth plea alleged a breach of warranty made in the renewal of said policy, that the hazard was no greater at the date of renewal than at the date of the policy.

The sixth plea was that the death of Mr. Wood did not result directly, and independently of all other causes, through external, accidental or violent means.

The seventh plea was that the death of Mr. Wood was due in whole or in part to certain diseases from which he had suffered long prior to the accident and which were in nowise caused by said accident.

The plaintiff joined issue on the first and second pleas, and replied to the third and fourth pleas that Rufus K. Wood was not and never had been subject to any infirmity, defect

586 STANDARD AC. & LIFE INS. CO. vs. WOOD.

Opinion of the Court.                    [116

or disease, whether mental or physical, and that the warranties therein alleged were true.

To the fifth plea she replied that Rufus K. Wood both at the issuance and the renewal of said policy was free from any infirmity, defect or disease; that the hazard was at no time greater than at the issuance of the policy, and that the alleged warranty was true at all times.

To the sixth plea she replied that the death of Rufus K. Wood was effected directly and independently of all other causes through external, accidental and violent means.

And to the seventh plea she replied that the death of Rufus K. Wood was not due in whole or in part to any disease, but was caused by said accident. Issue was joined upon all these replications, and a verdict was rendered for the plaintiff for $5,500, and this appeal is from the judgment entered on that verdict.

There were twenty exceptions to rulings on the evidence, and one to the ruling on the prayers.

The plaintiff offered but one prayer which was granted, viz, that if they found a verdict for the plaintiff the measure of damages should be the sum of $5,500, with interest in the discretion of the jury thereon from May 16th, 1909, the policy allowing ten per cent. per annum upon the principal sum of $5,000, for each renewal of the policy.

The defendant offered eighteen prayers; the first, second, third and fourth of which were in substance as follows:

The first asks an instruction that under the pleadings there is no evidence legally sufficient to entitle the plaintiff to recover, and therefore the verdict must be for the defendant.

The second, that it appears from the uncontradicted evidence that the death of the deceased did not result directly and independently of all other causes, from bodily injuries sustained through external, violent, and accidental means, and therefore under the pleadings their verdict must be for the defendant.

The third, that as it appears from the uncontradicted evidence that the deceased at the time of the date of the policy, and renewal thereof, warranted that he was in sound condition, mentally and physically, and that in fact he was not in sound condition mentally and physically at the time of the date of the policy and the renewal thereof, and, further that such breach of warranty is a matter material to the risk, and, therefore, under the pleadings their verdict must be for the defendant.

The fourth, that as it appears from the uncontradicted evidence that the deceased at the time of renewal of said policy warranted that the hazard of said risk was no greater than, or different from that of the hazard at the date of the policy, and that in fact it was a greater and different hazard, and that such breach of warranty was a matter material to the risk, therefore under the pleadings the verdict must be for the defendant.

The fifth was as follows: "The defendant prays the Court to instruct the jury that a bodily injury is anything which works harm to, or impairs the physical parts, and is to be distinguished from the event causing the injury; that this event may be either disease, or accident, or both, and that by the true construction of the policy offered in evidence in this case, the only bodily injuries insured against are those which are effected directly and independently of all other causes, through external, accidental, and violent means; and if they are effected through any other event, either in whole or in part, the policy according to its plain provisions, does not cover the case, that is to say, the injury which is within the policy must be traceable exclusively to an accident, and as it appears from the uncontradicted evidence that disease was at least a contributing factor to the death of the deceased, their verdict under the pleadings must be for the defendant."

These prayers are all demurrers to the evidence, the first asserting the general proposition that under the pleadings there is *no evidence* legally sufficient to warrant a recovery. The second and fifth assert substantially the same, somewhat

narrower, proposition, viz, that it appears from the uncontradicted evidence that death did not result directly and independently of all other causes, from bodily injuries sustained through external, violent and accidental means.

. The third and fourth each assert that the uncontradicted evidence shows a breach of a warranty in a matter material to the risk, thus defeating a recovery.

The first prayer cannot be granted if there is any evidence, however slight, tending to show that the death was due solely to the accident, and none of the others can be granted, unless the evidence referred to therein was in fact absolutely uncontradicted. It will be necessary therefore to examine carefully the evidence of the medical experts in the case.

Dr. Johnson, plaintiff's witness, on his examination in chief in reply to a question to what he attributed Mr. Wood's death, said: "I attribute his death to the accident followed by the pain, the wakefulness occasioned by it, the use of the anaesthetic, the chloroform, and the sudden movement which he made, a very dangerous thing in itself, which he made, after he had more or less recovered from the effects of the anaesthetic." Later he testified that he did not believe he would have died if he had not raised up on his elbows, and that a man organically sound, who raises up suddenly in bed after taking chloroform might fall back dead, and that if Mr. Wood had laid flat on his back he would not have died.

Dr. Woodward, for the plaintiff, testified in chief that he had been practising medicine since 1880 and had been resident surgeon at Sparrow Point 22 years; that he knew Mr. Wood intimately and his health was uniformly excellent; that he administered the anaesthetic when the temporary splints were applied on the day of the accident, and that Dr. Johnson examined his heart before it was administered. When asked to what he attributed Mr. Wood's death he replied: "I attribute it to the accident. If he had not received the broken leg, the injury, I do not think he would have died." He was asked further: "To what, if any, other

cause besides the accident, do you attribute his death," and he replied, "I think the sequences that entered into the case after the accident, were causes in addition to the accident to which death can be attributed. The fracture caused a great deal of pain and nervous exhaustion. He was depleted and weakened so that when the strain came he could not stand it. He did not have strength enough to withstand the effort he made; it put too much strain on his heart."

Dr. Peltekian, for the plaintiff testified that he had been practising medicine since 1893 and had been at Sparrows Point nine years, and knew Mr. Wood; that he administered the anaesthetic the morning that he died, and that before doing so, he examined his chest, his heart and his pulse in the usual way without an instrument, and found him to be in good condition for that purpose.

Dr. Ridgely B. Warfield, for the plaintiff, testified that he had been practising medicine since 1884; that he knew Mr. Wood, and on May 29th, 1907, he examined him carefully for life insurance in the New England Mutual Life Company; that his examination, included the heart and the lungs, the urine as to the condition of the kidneys, and the history of whatever illnesses he might have had. That the result was he found nothing the matter with Mr. Wood, nothing abnormal whatever, and he was given his policy. On cross-examination he said he was expected to discover whatever was discoverable by such an examination, but it was possible he might make a mistake; that *arterio sclerosis* is a relative thing, and that it was not to be expected that a man of Mr. Wood's age would have very soft arteries, but that *arterio sclerosis* is one of the things looked for in examining men of his age; that it was possible Mr. Wood might have had it, without his discovering it, and this would be true in such examination of any man.

Dr. Holland graduated from the University of Maryland in 1896, and Dr. Cone from the University of Pennsylvania in 1893, and they together performed the autopsy on Mr. Wood's body evidence of *arterio sclerosis* in an advanced

and without detailing their testimony it will suffice to say that they both testified positively that they found in Mr. Wood's body evidence of *arterio sclerosis* in an advanced stage; in their opinion, of at least two years standing. Dr. Holland said it was the remote cause of his death, and Dr. Cone said it was the immediate cause.

Between the evidence of Drs. Johnson, Woodward and Warfield, given in chief, and the evidence of Drs. Holland and Cone, there is a clear conflict as to the cause of death, and if it can be said, as the prayers we are now considering all substantially assert, that the uncontradicted evidence shows that Mr. Wood was suffering from a disease which was one of the causes contributing to his death, it can only be because upon cross-examination the evidence of those gentlemen was brought into confessed agreement with that of Drs. Holland and Cone.

Drs. Johnson and Woodward were cross-examined at great length, and with the vigor and skill demanded by the accident companies of their counsel and medical experts in resisting recoveries under the stringent and harsh provisions of their contracts. They were shown specimens of the arteries of Mr. Wood, taken at the autopsy and preserved in alcohol, and it was sought to extort from them the admission as a fact that these specimens showed the presence of *arterio sclerosis* as a contributing factor to the death of Mr. Wood.

Dr. Johnson's examination was especially searching and persistent. He agreed that *arterio sclerosis* was a recognized disease, and that a post mortem examination *might* show a diseased condition of the heart which the best clinical examination *might* not reveal; but he denied that it was more nearly certain than a clinical examination, and declared his opinion that it was an error to suppose it to be so, and that at the autopsy he saw the heart, either in his own hand, or that of one of the physicians performing it, and there was no evidence of *sclerosis* visible to the naked eye.

He was particularly pressed to say that he perceived in one of the specimens showed him, a thrombus, or clot, at a

certain point in the coronary artery, but he refused to admit that he could perceive it, and he said *assuming* the existence of a clot at the point indicated, and which Drs. Holland and Cone testified to have been a cause contributing to the death, that it was quite possible that clot was formed at the seat of the fracture, as a sequence of the injury and was carried up in the circulation and lodged in the coronary artery. He admitted that if such a clot was there, his heart was not in as good condition to resist strain upon it, as if no clot were there, but the record will be searched in vain for any admission by him that Mr. Wood actually had the disease known as *arterio sclerosis,* or that he actually had any disease which was one of the causes contributing to his death. The utmost that was drawn from him was, that *if the conditions existed* which were testified to by Drs. Holland and Cone, *then* those conditions were a contributing factor in his death.

His testimony was delivered with apparent candor and absence of any bias, and the statement most favorable to the contention of the defendant was the following:

"I do not think Mr. Wood would have died unless he had had the accident and *the sequence of the accident.* I believe *with the conditions* you have mentioned, Mr. Wood might have lived a number of years. I would not say that he was not in a diseased condition, and will not say that it did not contribute somewhat, *after he was hurt,* to his death; but to say that his death was entirely due to it, I do not believe it; I believe that the accident, and the sequences of the accident, I lay special stress on the wear and tear, the time he suffered, the pain and the taking of the chloroform, and the rising up in the bed, that is what I attribute it to. I believe that clot *that was said to be there* might have come up from the seat of fracture; sometimes a portion of a clot will become dislodged, and coming up through the vessels into the heart, it might have lodged there; if that was a clot it might have originated at the seat of fracture and been transferred up there, and located in the coronary artery. My honest belief is that if Mr. Wood had not had that accident

he might have lived for five or six years so far as his general condition was concerned. I mean any absolutely healthy man who received this accident, followed up with these sequences, under those conditions might have fallen over dead from a sudden exertion after taking an anaesthetic. I believe further that in this condition these things made him more liable to death."

Their answer must be taken in connection with the previous repeated refusal to admit the existence of the conditions testified to by Drs. Holland and Cone, and are to be based upon the same assumption of their existence which runs through all the testimony of Dr. Johnson.

Upon redirect examination Dr. Johnson in reply to a question whether Mr. Wood's death could not have occurred unless the conditions assumed had existed, said "I would not say so. I would say the death of Mr. Wood might have occurred as a sequence of that accident, the chloroform, etc., and the uprising of a man whose arteries were healthy."

Upon these answers it can not arbitrarily be said that Dr. Johnson's evidence is in accord with that of Drs. Holland and Cone as to the *fact* that Mr. Wood had *arterio sclerosis* or *any other disease* which contributed to his death. His evidence *upon those facts* is still in disagreement with that of Drs. Holland and Cone.

Dr. Woodward on cross-examination admitted that if the existence of the conditions testified to by Drs. Holland and Cone was assumed "they were more or less contributing" to the death, but he nowhere admitted their existence, and he is not brought into agreement upon those vital facts.

Nor is Dr. Warfield's evidence as to the result of his examination for life insurance eliminated, or its probative value affected. The vital fact therefore of the existence of a disease which was a contributory cause to death remains for the jury to determine upon the weight of all the evidence, and the defendant's first, second, third, fourth and fifth prayers were properly rejected.

The case of *Thomas* v. *Fidelity & Casualty Company,* 106 Md. 299, is relied upon by the appellant here as conclusive of this case, this Court having affirmed a judgment of the Court of Common Pleas of Baltimore City in favor of the company, entered after the Court, at the conclusion of the plaintiff's case had granted a prayer that it appeared from the uncontradicted evidence that the death of the deceased did not result directly and independently of all other causes from bodily injuries sustained through external, violent and accidental means, and therefore under the pleadings their verdict must be for the defendant. In that case the accident was the fracture of a leg as in this case, but there the only medical evidence was that of Dr. Chambers, the physician of the deceased, who not only stated in the proofs of loss submitted to the company that the primary cause of death was shock due to the fall, but also that there was a contributory cause, *encephalo meningitis,* and further testified at the trial that he had that disease, and that it was a contributory cause, and that at the time of the accident he was suffering from *arterio sclerosis,* which often produces *encephalo meningitis.*

The defendant having grouped together for convenience its first, tenth, eleventh and sixteenth exceptions, they will be considered in that order.

The first exception was to allowing Dr. Johnson to state what Mr. Wood's general health was, the ground of the objection being that, while he saw him socially very frequently, he rarely attended him professionally. We think there was sufficient opportunity for observation upon which to found the opinion expressed. An analogous case is found in *Jones* v. *Collins,* 94 Md. 413, where a physician who knew a testator well but had never attended him, was allowed to give his opinion upon his mental capacity, without stating the facts on which his opinion was formed.

In the tenth exception Dr. Woodward was asked if an examination of Mr. Wood's heart had been made before the anæsthetic was administered, and he answered: "Yes; I am

satisfied that the doctor examined his heart." The defendant moved to strike out the answer upon the ground that it stated only an inference, but the Court refused to strike it out. The answer was specific, *"Yes,"* and the added words are equivalent to "I am confident of it." Moreover, Dr. Johnson had already positively proved such examination.

The eleventh exception was abandoned in the brief.

The sixteenth exception was to allowing Dr. Woodward on re-direct examination to answer a question as to what his opinion would be in regard to Mr. Wood's death, whether it could have happened unless the conditions testified to by defendant's witnesses had existed, the appellant alleging that it was immaterial to inquire what was *possible* to happen, because it alleged Dr. Woodward had already testified that those conditions had in fact existed and had contributed to his death. But we have already said in considering Dr. Woodward's testimony in connection with the prayers which sought to direct a verdict for the defendant, that Dr. Woodward had made no admission that such conditions did actually exist, and consequently there was no error in the ruling on this exception.

The defendant's sixth, seventh, eighth and ninth exceptions all relate to Dr. Warfield's testimony as to Mr. Wood's physical condition when he examined him for life insurance in May, 1907; and the contention is that the only contract between the plaintiff and the defendant in this case was made through the renewal of the policy in May, 1908, and that as Dr. Woodward testified he could not say as the result of the examination in May, 1907, that Mr. Wood was free from disease in May, 1908, his testimony as to May, 1907, was wholly immaterial and improper.

But the renewal in May, 1908, did not introduce either a new contract or a new cause of action. The payment of the annual premium provided in the policy in May, 1908, merely prevented the lapse of the policy and extended its life. The policy constitutes the contract or cause of action, and not the renewal receipt, which is only evidence of the extension or

continuance of the contract for another year, and in clause 5 of the policy provision is expressly made for "renewal of this policy" by payment of the premium annually in advance.

The second, third, fourth, fifth, twelfth and fifteenth exceptions all relate to answers given by Drs. Johnson and Woodward as to what caused Mr. Wood's death in which they lay stress upon the strain put on his heart by his raising himself on his elbows, and the appellants contend that all this evidence was based upon a fact assumed by them to be true, viz, that he did raise on his elbows, because it had been so stated to them by the nurse, Sarah Lynch, whereas she did not actually testify to that fact until after the testimony of Drs. Johnson and Woodward had been given, and Mrs. Wood, who testified before the doctors, only stated that he raised his head at that time, without stating that he raised on his elbows. Whatever technical support may be found for these exceptions in the rule that expert witnesses can base their opinion only upon the facts in evidence in the case, they are without merit in the present case, as the fact that he did raise upon his elbows was subsequently proved as part of the plaintiff's case, and both doctors stated at the time of testifying that that fact had been communicated to them as part of the history of the case. A better course would have been when the objection was first made, to ask leave of the Court to suspend the examination of the expert, and prove the fact then, and such leave would have been granted as a matter of course. The testimony of the experts was followed up by proof of the fact, and we can not hold there was any reversible error in these exceptions. To do so would be to ally the Court with the accident insurance companies in defeating legitimate recoveries by a strict and harsh construction of the rules of evidence.

The seventeenth exception arose in this way. One of the questions in the case was, what effect the formaldehyde in the embalming fluid used in preparing the body for burial, might have had upon the arteries and other organs taken from the body at the autopsy, as depending upon the percentage

of formaldehyde in the fluid. The undertaker testified that he gave Dr. Holland samples of the fluid used in his work, but could not say those samples were of the same composition as those used on Mr. Wood, which he had procured two years previously, though from the same Philadelphia firm. Dr. Hoffman, a chemist, then testified that he analyzed these samples for Dr. Holland, to test the percentage of formaldehyde, but upon plaintiff's objection was not allowed to state the result of his analysis. We do not think this afforded a sufficient foundation for a presumption that these samples were of the same quality as that used in this case, and the ruling was therefore correct.

The eighteenth, nineteenth and twentieth exceptions were taken to the refusal of the Court to allow Mr. Tongue the agent of defendant who wrote the policy, to say whether he would have written it if he had then known of the condition of Mr. Wood's organs as had been testified to in this case.

Counsel for appellants have cited no authority for these exceptions, and have stated no satisfactory reason why they should be sustained. If he had been allowed to answer, his reply, whatever it might be, could not have aided the jury in reaching their verdict. If he had replied in the affirmative it would have been impossible to believe him, and if in the negative, it would have added nothing to their assurance that he would not have written the policy with such knowledge. In no aspect of the case could his reply have influenced the verdict.

What we have said in reference to the sixth, seventh, eighth and ninth exceptions disposes of the point made that no counsel fee should have been allowed, as that point rests upon the contention that the renewal receipt, and not the policy, was the cause of action, and that under the Practice Act, the former should have been filed with the declaration.

The defendants remaining rejected prayers the eleventh, thirteenth, sixteenth and seventeenth, and his modified eighteenth prayer will be set out by the reporter.

The eleventh prayer was not objectionable in form or principle, but the sixth and seventh granted prayers embraced everything contained in the eleventh.

The sixth instructed the jury that the burden was on the plaintiff to establish by a preponderance of testimony that the accident, independently of all other causes, produced the death; which is but another mode of instructing that there was no presumption to that effect, apart from affirmative proof; and the seventh fully covered the other branch of the eleventh prayer, as to the effect of disease as a contributory cause of death.

The vice of the thirteenth prayer is that it allowed the jury to give their verdict for defendant if they found the warranties mentioned therein to be untrue, without also finding that they were material.

It is only in exceptional cases that the question of materiality can be withdrawn from the jury, as where the evidence is uncontradicted, or such that but one inference can be drawn from it. *Md. Casualty Co. v. Gehrmann*, 96 Md. 651; *Bankers Life Ins. Co.*, 100 Md. 1. In all other cases that question is for the jury as properly provided in defendants fourteenth granted prayer.

The sixteenth, seventeenth and eighteenth prayers all relate to the embalming fluid used upon the body of Mr. Wood.

The sixteenth asked an instruction that the uncontradicted evidence showed the percentage of formaldehyde in that fluid, was less than 4½ per cent., and therefore the jury should disregard all evidence as to the effect upon the organs of the body of a fluid containing a larger percentage. There was no evidence of the percentage in the fluid used. Mr. Becker the undertaker, did not state the percentage, but said its main property was formaldehyde. Dr. Cone said: "I do not know what per cent. the embalmer used." Mr. Becker was then recalled and said the fluid was a proprietary article, and the percentage of ingredients was a secret. "Just what the percentage of formaldehyde is, we do not know." That prayer therefore could not have been properly granted.

The eighteenth prayer which as granted instructed the jury that there was no evidence legally sufficient to show that the embalming fluid which was injected into the body of Mr. Wood affected any organs or parts of the body in such a way as to cause contraction or shrinking, was modified before it was granted by striking out the concluding words. viz, "or to interfere in the slightest degree with an accurate post mortem examination of the physical condition of said organs or other physical parts of the body."

The only suggestion in the record of any effect produced by the embalming fluid was that it might have contracted the specimens of the arteries taken out at the autopsy. Upon this point the instruction was full and positive, and we can discover no possible injury to defendant by reason of the above modification.

Finding no error in any of the rulings of the Court the judgment will be affirmed.

*Judgment affirmed, the appellant to pay the costs above and below.*