**Helen VARGO**

v.

**NEW YORK LIFE INSURANCE COMPANY.**

**No. 11085.**

United States District Court
D. Maryland,
Civil Division.

Dec. 29, 1959.

---

O'Connor & Preston, John C. Evelius, Baltimore, Md., John J. Bishop, Jr., Towson, Md., for plaintiff.

Ward B. Coe, Jr., John F. King, Anderson, Barnes & Coe, Baltimore, Md., for defendant.

CHESNUT, District Judge.

On January 1, 1957 the New York Life Insurance Company issued to the Henry J. Kaiser Company of California, a group life insurance policy covering its employees. Steve Vargo, a foreman of the Kaiser Aluminum and Chemical Company at Halethorpe, Maryland (a subsidiary of the Henry J. Kaiser Company of California), was included in the coverage of the policy and designated his wife, Helen Vargo, as the beneficiary.

Vargo died at the South Baltimore General Hospital in Baltimore, Maryland, on December 3, 1957, as a direct result of uremic poisoning ensuing seven days after a prolonged five-hour surgical operation for the removal of a large mass of peptic ulcer. The Insurance Company promptly paid the amount due under the policy for loss of life in the amount of $15,840; but refused, after investigation of the facts as to the cause of death, to pay an additional like sum under the provision of the policy for double indemnity under certain conditions. The plaintiff, the widow of Steve Vargo, then instituted this suit to recover the amount of the double indemnity.

The pertinent policy provision with respect to the payment of double indemnity was as follows:

"Accidental Death and Dismemberment Benefits

"Subject to the Limitations provisions, if an employee, while insured by these Accidental Death and Dismemberment Insurance provisions, sustains bodily injuries effected solely through external, violent and accidental means, and as a result thereof suffers within ninety days one of the following losses, New York Life will pay:

"1. for loss of life, the applicable amount of Accidental Death and Dismemberment Insurance in the Schedule of Insurance; ($15,840)
* * *

"Limitations

"No Benefits under these accidental death and dismemberment Insurance provisions shall be paid for:

"1. Disease or bodily or mental infirmity, or medical or surgical treatment thereof, ptomaine or bacterial infections (except infections occurring through an accidental cut or wound) or * * *."

The contention of the plaintiff necessarily was that the proximate cause of the death of Vargo was due solely to accident, as required by the conditions of the policy; but the contention of the defendant was first that there was no evidence legally sufficient to show that his death was due to accident but was proximately caused by a pre-existing disease or at least, under the conditions of the policy, it was due to pre-existing disease with the accident as a contributing cause only. The jurisdiction of the court was based solely on diversity of citizenship

and for that reason the answer to the question was necessarily dependent upon the law of Maryland, and in addition thereto it was expressly stipulated by the parties that the determination should be in accordance with the laws of Maryland. At the conclusion of the evidence the defendant moved for a directed verdict in its favor. After some hours of deliberation, the jury disagreed and was discharged without a verdict. Thereupon in due time the defendant has renewed its motion for a directed verdict in accordance with the provisions of Federal Rules of Civil Procedure, No. 50(b), 28 U.S. C.A.

The medical testimony has been fully transcribed and in addition thereto the dominant and controlling facts of the case may be succinctly stated.

Vargo was a man of 52 years of age. For about five years prior to his automobile accident he had had a serious and difficult case of marginal ulcer, duodenal or peptic, or both. In 1952 he was hospitalized for this condition for four days at St. Agnes Hospital. In 1953 a surgical operation of a partial gastrectomy was performed, with hospitalization of about two weeks. Again for four days in 1954 he was hospitalized; and again for twelve days in September 1956 when his condition was diagnosed as marginal ulcer and diabetes mellitus. Again in March 1957 he was hospitalized for bleeding peptic ulcer and diabetes mellitus. Still again in September 1957 he was hospitalized for marginal ulcer. This time he was discharged September 12, 1957, just nine days before an automobile accident.

On September 21, 1957 he was involved in an automobile accident and taken to the South Baltimore General Hospital where his condition was diagnosed as fractured left humerus, cerebral concussion, multiple abrasions and contusions, fracture of the left and right fourth and fifth ribs. On arrival at the hospital he was conscious and gave a history of having diabetes mellitus since the preceding September and of having had a gastrectomy five years previously for peptic ulcer. A day later he became unconscious and was fed intravenously for nine days. Ultimately he recovered from the injuries sustained in the accident and was discharged in generally good condition on November 5, 1957. He visited Dr. Shipley, his attending surgeon, on November 11, 1957 when his condition was found to be approximately the same as when he was discharged from the hospital; but one week later he again consulted Dr. Shipley saying that he had been quite ill with vomiting and he was again ordered hospitalized by Dr. Shipley. On November 26, 1957 X-rays were taken which disclosed a large mass at the juncture where previous surgery had been performed. Dr. Shipley then performed abdominal surgery for the removal of the mass which at first was suspected to be of a cancerous nature but subsequently on closer examination found to be a simple peptic ulcer. The operation was a long one of about five hours. About twelve hours after the operation he went into a state of shock. He was given blood, oxygen and drugs and improved, but several days later suffered a kidney shut down and on December 3, 1957 he died of uremia or kidney failure.

█ It is not disputed that the plaintiff had the burden of proof to show that Vargo's death was proximately due to the accident. Thomas v. Fidelity & Casualty Co., 1907, 106 Md. 299, 67 A. 259; Standard Accident & Life Insurance Co. of Detroit, Mich. v. Wood, 1911, 116 Md. 575, 82 A. 702. In my opinion the plaintiff failed to show that the death was proximately caused by the accident. The theory of the plaintiff was that the effect of the accident required intravenous feeding of the insured during some days of his hospitalization and that reactivated his ulcer and ultimately caused his death. A reading of the whole of the medical testimony given only by Drs. Shipley and Fisher failed to show this causal relation with reasonable probability or certainty. Neither Doctor expressed any opinion that death was either caused proximately by the accident or by the accident as a proximately con-

tributing cause. With respect to the effect of intravenous feeding, the most that either Doctor could say was to the effect that the proper treatment for an ulcer is a prescribed diet and that the absence of such a prescribed or balanced diet may or "would appear to have had" some prejudicial effect on an ulcer.[1] This is not a

4. Dr. Shipley, called as a witness by the plaintiff, was the attending surgeon for Vargo throughout his hospitalization at the South Baltimore General Hospital, beginning just after the automobile accident until he was discharged on November 5, 1957, with respect thereto, and then again beginning on November 18, 1957 when he was re-admitted for illness relating to his ulcer.

The more significant testimony given by Dr. Shipley is found in his answers to questions by counsel for the plaintiff:

"Q. What was again the medical cause of Steve Vargo's death, Doctor? A. The medical cause of his death was kidney failure which was itself secondary to an operative procedure which was caused by his large ulcer between the stomach and small intestine. * * *

"Q. What effect, Doctor, would that have, if any, upon a patient with an ulcer history? * * * A. The intravenous feeding itself would have no effect on the ulcer. This is a way of sustaining life. I think what you are trying to establish is the fact that the man didnt take food by mouth and wasnt able to take medication by mouth which possibly should have been used in the treatment of an ulcer. * * *

"Q. What effect does an imbalance of diet have upon the treatment of an ulcer? * * * A. We know by experience, if the Court please, we know by experience that a patient who has an ulcer if he dont follow the prescribed diet or adequate diet, may have an activation of the ulcer. * * *

"Q. Do you have an opinion based upon all the history and examination of Steve Vargo as to whether or not there was any causal connection between the accident and the re-activation of the previous ulcer condition? * * * A. No, sir.

"Q: Sir? A. No sir, I dont believe I can too. * * *

"Q. Doctor, do you have an opinion based upon the record of the South Baltimore General Hospital and based upon your examination of the patient, the operation, your knowledge of the accident on the 21st of September, 1957, as to whether or not the deceased could have lived indefinitely but for the accident that I understand was on November 21, 1957?

"By the Court: In the first place I will ask, Doctor, do you think you can answer that question?

"A. I would be guessing on my part. * * *

"Q. Do you have an opinion in this case, Doctor, concerning Steve Vargo's re-activation of his physical condition based upon his inability to take food through the mouth for 8 or 9 days? A. In my opinion this patient was injured and as a result of the injuries he could not take food. This was established. We know that this may in some cases accelerate an ulcer. The patient when he was discharged, however, at the time of discharge, was apparently well and had no complaints. The complaints began after he went home."

Dr. Fisher, also called as an expert witness for the plaintiff, did not see or attend Steve Vargo at any time prior to his death. As stated by counsel, he was called only to answer hypothetical questions based on his hearing the testimony of Dr. Shipley and others in court and based principally on the records of the South Baltimore General Hospital. He had not previously seen the records of St. Agnes Hospital relating to Steve Vargo. He was asked only a few questions by counsel for the plaintiff, the principal ones being as follows:

"Q. What effect, if any, would the fact of Mr. Vargo's unconsciousness have had upon an ulcer? A. Again one deals in generalities before he attempts to get specific but it is true that an ulcer may become, they may occur because of coma, unconsciousness in cases of severe head injuries. To answer specifically for this case, the nature and severity of Mr. Vargo's head injury is not such as to be a compelling argument to me that the coma alone caused this ulcer. It is apparent that he had this ulcer while in the hospital. It is apparent from the pathology as described by both the surgeon and the pathologist, this was not an ulcer which developed in one week or in two weeks or even in three weeks after he left the hospital. It seems probable that he had an older ulcer even before the accident. But this is difficult to be sure of from what is written in this record alone which is already now, I believe, before us. * * *

"Q. Have you finished? A. I dont believe so but now that the question seems to turn that he had an ulcer before the

sufficient degree of opinion based on reasonable probability or certainty as is legally required to support the plaintiff's contention. Ager v. Baltimore Transit Co., 1957, 213 Md. 414, 132 A.2d 469; Langenfelder v. Jones, 1940, 178 Md. 421, 123 A. 623; 15 A.2d 422; and Calder v. Levi, 1935, 168 Md. 260, 177 A. 392, 97 A.L.R. 880.

Even if the medical testimony had been sufficient to show that the accident was one of two or more concurring proximate causes of death, it is clear under the decisions of the Maryland Court of Appeals that the plaintiff would not be entitled to recover double indemnity in this case under the particular policy provisions. In the Thomas case, supra, the special provision of the accident policy sued on was "against death resulting, directly and independently of all other causes, from bodily injuries sustained through external, violent, and accidental means * * *." [106 Md. 299, 67 A. 259.] Col. Thomas, a man 64 years of age, slipped on ice on the pavement near the Rennert Hotel, and fell breaking a bone in one leg. The accident occurred on December 17, 1904. His attending surgeon was the well-known Dr. Chambers. At the time of Col. Thomas' death on January 31, 1905, his leg had completely healed. Dr. Chambers' certificate of death stated that death was due to the injury and consequent shock of the fall, and encephalo meningitis; and in addition thereto Col. Thomas had had considerable arteriosclerosis. Dr. Chambers also testified that the injury received from the fall would not of itself have caused the death of Col. Thomas had it not been for the contributing arteriosclerosis and encephalomeningitis. The trial court found a verdict for the defendant which was affirmed on appeal. In the opinion of the court, 106 Md. at page 317, 67 A. at page 261, it was said: "On the state of facts disclosed by the record, we are of the opinion, that the court below was entirely right in withdrawing this case from the jury, and in granting the defendant's second prayer, to the effect that the death of the insured did not result directly and independently of all other causes, from bodily injuries sustained through external, violent and accidental means." [2]

In the succeeding case of Standard Accident & Life Insurance Co. v. Wood, supra, where the policy provision with respect to accident as the cause of death was substantially the same in effect as in the Thomas case, but where the evidence was materially different, the Court of Appeals in a lengthy opinion by Judge Pearce sustained a verdict in favor of

---

accident and we have now heard indications that he had coma, that he had a fracture with obvious pain and suffering, that he had a period when he had to be fed intravenously because of the coma and a further period when his diet was disturbed. These are factors in which this specific case would appear to have had an effect upon the ulcer."

2. The precise issue of law submitted to and decided by the court in the Thomas case is brought into even sharper focus by the briefs of opposing counsel. At the time (1907) it was still not uncustomary for the court reporter to preface the court's opinion by a summary of the briefs of opposing counsel. The briefs in that case were evidently well prepared. Counsel for the appellant were Clarence A. Tucker and Joseph N. Ulman, and for the appellee, Vernon Cook and Charles Markell. Messrs. Tucker and Cook were then well-known younger trial lawyers, and Mr. Ulman subsequently became an Associate Judge of the Supreme Bench of Baltimore, and Mr. Markell became Chief Judge of the Maryland Court of Appeals.

A review of the briefs brings out very well the decisive and controlling point in the case. It will be noted that the main contention of the appellee was based on the doctrine of the Shryock case, National Masonic Accident Ass'n v. Shryock, 8 Cir., 73 F. 774, which was approved in the opinion of the Court, and the brief of the appellee also referred to the several types of cases seemingly contrary to the Shryock case. And it appears that in the brief of the appellant, while seeking to distinguish the Shryock case on the facts, nevertheless apparently conceded that if a pre-existing disease was a contributing factor in the cause of death, then the plaintiff was not entitled to recover.

the plaintiff; but it will be found in the opinion (116 Md. at page 597, 82 A. at page 704) that the Court approved the seventh prayer of the defendant as the proper applicable law which read:

"The Court instructs the jury that by the true construction of the policy offered in evidence in this case, before they can find a verdict in favor of the plaintiff they must find that the death of Rufus K. Wood resulted solely from bodily injuries effected through external, violent and accidental means directly and independently of all other causes; and if the jury find that certain organs of the body of the said Rufus K. Wood were in a diseased condition, and that that condition was a contributing cause to his death, then even though the jury may find that the accident aggravated that condition, and that but for the accident he might not have died, when and as he did die, their verdict should nevertheless be for the defendant."

It thus appears that both in the Thomas case and in the Wood case, although the results were different by reason of different facts, the applicable law with regard to accidental death under a policy so worded is the same; and shortly stated, is that the plaintiff is not entitled to recover on such a policy if a prior illness of the decedent was a proximately contributing cause of death, even though the effect of the accident may have been to aggravate the disease.

So far as I know or can find, this is the Maryland law upon the subject and has not been changed or modified by any subsequent decision of the Maryland Court of Appeals. Inferentially it seems to have been so recognized in Metropolitan Life Ins. Co. v. Neikirk, 1938, 175 Md. 163, 200 A. 370.

The provisions of the policy in the instant case are, I think, substantially of the same effect as in the Thomas and Wood cases. The word "solely" in the policy here is of like effect with the phrase "directly and independently of all other causes". The Thomas case cites with approval the early and well-known case of National Masonic Accident Ass'n v. Shryock, 8 Cir., 1896, 73 F. 774. In the latter case the policy provision regarding accident was:

" * * * if the death of William B. Shryock should result through external, violent, and accidental means alone, which should, independently of all other causes, cause his death within 90 days of the date of the accident * * * 'this insurance does not cover * * * disease or bodily infirmity.'" (Italics supplied.) And in the opinion Judge Sanborn refers to the conditions of the policy regarding accidental death as solely. Thus we see that the substantial legal effect of the policy provision in the Thomas and Wood cases and in the Shryock case are the same. In approving the Shryock case Judge Briscoe of the Maryland Court of Appeals quoted from it at some length as follows:

"If Shryock suffered such an accident, and his death was caused by that alone, the association agreed by this certificate to pay the promised indemnity. But if he was affected with a disease or bodily infirmity which caused his death, the association was not liable under this certificate, whether he also suffered an accident or not. If he sustained an accident, but at the time it occurred he was suffering from a pre-existing disease or bodily infirmity, and if the accident would not have caused his death if he had not been affected with the disease or infirmity, but he died because the accident aggravated the effects of the disease, or the disease aggravated the effects of the accident, the express contract was that the association should not be liable for the amount of this insurance."

The Shryock case is a well-known authority and the opinion is by a Judge of well-known ability. The legal doctrine in cases of this kind has been approved and followed in many later cases especially in the federal courts as the well established law in cases prior to Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 in 1938, and since then where the State law was not controlling. See for instance, Commercial Travelers' Mut. Acc. Ass'n v. Fulton, 2 Cir., 1897,

79 F. 423; Preferred Accident Ins. Co. of New York v. Combs, 8 Cir., 1935, 76 F. 2d 775; White v. New York Life Ins. Co., 5 Cir., 1944, 145 F.2d 504 and Ryan v. Continental Casualty Co., 5 Cir., 1931, 47 F.2d 472, and Korff v. Travelers Ins. Co., 7 Cir., 1936, 83 F.2d 45. The only federal appellate decision that I have noted that questions the soundness of the Shryock case is Mandles v. Guardian Life Ins. Co., 10 Cir., 1940, 115 F.2d 994 where the facts, however, were quite different from those of the instant case.

The contention of counsel for the plaintiff in this case seems to be that the instant case is not precisely like the Thomas case and that therefore resort should be had to decisions in other States. He particularly stresses the case of Equitable Life Assurance Society of United States v. Gratiot, 1932, 45 Wyo. 1, 14 P.2d 438, 82 A.L.R. 1397. The reasoning of that case seems to be that, with respect to the effect of disease pre-existing an accident, that the disease should be considered simply as an existing condition on which the accident was superimposed; and that it must be regarded as a question for the jury rather than for the court where there is any sufficient evidence to show that the accidental injury may have been *a* proximate cause of the death, provided it is not clear that the pre-existing disease was at best only a remote cause of the death. Other cases seem to give weighty consideration to the question of whether the pre-existing disease was a minor or grave one in proportion to the nature and effect of the accident itself. While there have been decisions in States other than Maryland which seem to be more liberal in the application of the law in favor of the insured, the doctrine of the Shryock case is well recognized and followed in many jurisdictions other than Maryland. See 1 Appleman on Insurance, s. 403, p. 494; 45 C.J.S. Insurance § 756, p. 785, and § 776, p. 809, wherein it is said at page 813:

"*Aggravation of disease or infirmity.* It has been held that no recovery can be had for a death or disability, on the ground that it results solely from accidental injury, where the injury aggravates the effect of a preexisting disease or infirmity, or the disease or infirmity aggravates the effect of the injury, and both together caused the death or disability, even though it is thereby caused at a period sooner than it otherwise would have occurred." See illustrative cases from many States cited in support of this text. See also 131 A.L.R. p. 240.

The undisputed facts in the instant case stand out strongly in showing the grave nature of the pre-existing illness and its consequent ultimate effect in causing the death of the insured. In contrast the effects, if any, of the accident, in relation to the insured's death, were at the most only minor and conjectural.

The intent of the parties to this insurance contract must be found in its wording and when so found must be enforced. Dulany v. Fidelity & Casualty Co., 1907, 106 Md. 17, 66 A. 614. In the positive insuring clause for double indemnity due to accidental death, it is plainly provided that the accident must have been the *sole* cause of death; and in the subsequent limitation clause it is also clearly provided that the insurer assumes no liability for injury due to medical or surgical services. In the instant case I think there could be no reasonable finding that the insured's death was due *solely* to the accident and no reasonable finding that it was not due at least as a contributing cause to a preexisting ulcer. This being so, the conclusion is clear that the judgment must be for the defendant. Flannagan v. Provident Life & Accident Ins. Co., 4 Cir., 1927, 22 F.2d 136; Fidelity-Phenix Fire Ins. Co. of New York v. Pilot Freight Carriers, 4 Cir., 1952, 193 F.2d 812, 31 A.L.R.2d 839.

For all these reasons I conclude that the motion of the defendant to direct a verdict for the defendant must be *granted* and therefore the Clerk will enter judgment for the defendant in this case, this 29th day of December, 1959.