[APRIL TERM, 1932]

---

## EQUITABLE LIFE ASSUR. SOC. OF UNITED STATES v. GRATIOT
(No. 1742; Sept. 26, 1932; 14 Pac. (2d) 438)

For the plaintiff in error there was a brief by *Hagens &
Wehrli* of Casper, Wyoming, and oral argument by *Mr.
G. R. Hagens.*

For the defendant in error there was a brief by *Durham* and *Bacheller* of Casper, Wyoming, and oral argument by *Mr. E. Paul Bacheller.*

4

*Hagens* and *Wehrli* in reply.

**BLUME, Justice.**

This is an action upon a life insurance policy of $2500 issued to James T. Gratiot during his life time, and providing for double indemnity in case of death through accident. Gratiot died on July 11, 1930. The amount of ordinary insurance, namely, the sum of $2500, was paid, but payment of double indemnity was refused, and this suit was brought to recover it. The case was tried to a jury who returned a verdict for the amount claimed. Judgment was rendered thereon, and the insurance company, the defendant, has appealed. It is its contention that the evidence fails to show that the deceased suffered any accident, and if it could be assumed that he did, the evidence fails to show that such accident was the sole and exclusive cause of the injury of which the deceased died, but that, on the contrary, it is conclusively shown that an aneurysm was at least one of the causes of death. The clauses in the policy referring to double indemnity are as follows:

"Upon due proof that the death of the Insured occurred in consequence of bodily injury effected solely through external, violent and accidental means, of which, except in case of drowning or of internal injuries revealed by an autopsy, there is a visible contusion or wound on the exterior of the body, and that such death occurred within ninety days after such injuries were sustained and as the direct result thereof independent of all other causes, the Society will pay instead of the face amount of this policy, double that amount, making FIVE THOUSAND DOLLARS * * *.

This agreement, to pay an increased amount in the event of death from bodily injury, does not cover self-destruction, sane or insane; death resulting from participation in aeronautics or submarine expeditions; *death caused directly or indirectly, wholly or partly,* by war, riot, or insurrection, or any act incident thereto, either on land or water; death resulting from any violation of law or from military or

naval service of any kind, or from police duty in any military, naval or police organization; or *death resulting directly or indirectly from bodily or mental infirmity,* ptomaines, or bacterial infections other than infection occurring simultaneously with and in consequence of an accidental cut or wound."

The evidence discloses, briefly, the following facts: The deceased conducted a "dude ranch" at Brooks Lake, Wyoming. On July 2, 1930, in company with four guests, he drove from his ranch to Moran, Wyoming, a distance of about 40 miles from Brooks Lake, returning about 11 o'clock P. M. Apparently, as some of the witnesses testified, because of a car approaching from the rear "crowding" him, his own automobile went off the highway down a steep, nearly perpendicular, embankment, some five to ten feet deep, striking some rocks when the car reached the bottom with a very sudden jolt, all the wheels being off the road, with one of them up in the air. Efforts were made to get the car back upon the highway, but without avail. The deceased thereupon, in company with another, walked a distance of about one-half mile for assistance. With such assistance the car was restored to the highway, and the deceased and his guests then continued their journey to Brooks Lake, a distance of about 17 miles from the point of the accident. Immediately after the accident, according to some of the guests, witnesses in the case, Mr. Gratiot's speech was slurred; he seemed mentally dull, tired, "hazy, groggy and listless." The next day it was observed that his mind was not clear; he seemed to be "groggy," slept in the middle of the day, which he had never done before, and was inconsistent in giving his orders to employees. This condition continued, though deceased did not complain, never saying anything about the accident except that he was sorry that it happened, until the morning of July 8, 1930, when he was found in bed suffering from a paralytic stroke. Dr. Replogle was

immediately called from Lander, and Mr. Gratiot was removed to a hospital of that place, where, on July 11, 1930, he died of paralysis caused from a cerebral hemorrhage. An autopsy performed some time later disclosed that the rupture took place at a point of an aneurysm on the basilar artery of the brain. An aneurysm was explained as a bulge in the artery, and the weakest part thereof.

Witnesses other than physicians testified that the deceased was in excellent health prior to the accident; that he was robust, strong and active in the performance of his duties. Much medical testimony was introduced. Dr. O'Connor, of Chicago, testified that he first saw Mr. Gratiot on June 10, 1927, then 43 years of age; that he treated him on June 6, 1930, to discover the cause of glaucoma; that he gave him a complete physical examination, including the heart, lungs, blood pressure, urine and prostate gland; that deceased was then in good physical condition; that his blood pressure was 98 distolic and 158 systolic, which, in his opinion, was within the normal limits for a man of the age of Mr. Gratiot; that at that time he found no evidence of sclerosis or hardening of the arteries; that such hardening is not a disease, but a condition of the tissues developing gradually over a period of years; that there was no symptomatic or clinical sign of any aneurysm, though it might exist; that this subject, however, was not in the direct line of his practice; that a physical shock is liable to cause hemorrhage from any vessel of the body; that an acute dilation of the wall of a vessel results from trauma direct or indirect, and sometimes from syphilis or localized infection.

Dr. Replogle testified that he had known the deceased for about 11 years and had frequently examined him; that he had treated him for glaucoma, a condition of the eye; that before July 2, 1930, he was as nearly normal as could be, except for a slight infection of the prostate; that the blood pressure of the deceased from 1928 on had

been 98 distolic and 158 systolic, which he considered normal and which varied little till death; that deceased became paralyzed on July 8, 1930, which was caused, directly, by hemorrhage of the brain; that the hemorrhage was caused by a broken artery as a result of the automobile accident, that accident causing a slow leak of some vessel of the brain, the leak producing a slow growing tumor or tumor mass, which would produce pressure, eventually manifesting itself in paralysis. The witness could not tell whether deceased was suffering from an aneurysm before the automobile accident; he stated that an aneurysm is a dilated portion of an artery, similar to a bubble of an inner tube of an automobile; that it is the weakest spot of an artery, tending to cause its rupture there more easily than at any other place; that, while he could not swear that the rupture was not caused by an aneurysm, independent of an accident, it was his opinion that the accident caused it.

Dr. McClellan testified that he, together with Dr. Kamp and Dr. Hillkowitz, performed an autopsy on the body of the deceased; that it disclosed that the deceased died as a result of a rupture at the place of an aneurysm of the basilar artery and of hemorrhage; that hemorrhage might have continued for a number of days; that trauma, even a turning over in bed, might cause a rupture of an aneurysm; that an aneurysm would likely cause a man to die sooner than otherwise; that the aneurysm in this case contributed to the death; that aneurysms, however, are classified; that, in his opinion, the aneurysm of the deceased was latent. His testimony on this point is as follows:

''A. Aneurysm is classified by aneurysms which give signs at the examination, aneurysms which give symptoms to the patient, and aneurysms which give no symptoms, or aneurysms of latency. I believe the aneurysm discovered in the autopsy is an aneurysm of latency. Q. What do

you mean by latency? A. That will not give any symptoms; that will go on, and on and on, without any condition by which you are able to determine the presence of it. Q. Does a latent aneurysm interfere with one's regular routine duties or health? A. No. Q. With latent aneurysm you may state whether or not an individual would live out his normal span of life? A. He probably would without some trauma interfered with his aneurysm latency, cause it to be symptomatic.''

He further testified that in the present case the aneurysm, in his opinion, would not have been ruptured except for the automobile accident; that the arteriosclerosis of the deceased had nothing to do with his death.

Dr. Kamp, a witness for the defendant, testified to a greater hardening of the arteries than Dr. McClellan and did not consider the blood pressure of the deceased to be normal, and believed that the accident, and the mental condition of the deceased subsequently, were due to the arteriosclerosis of deceased. Asked as to the cause of the death, he stated that ''hemorrhage of the brain from existing aneurysm perhaps would be caused from shock from running off the road,'' and that the automobile accident may, indirectly, have had something to do with the death; that an aneurysm is progressive and would tend to shorten the life of the deceased, depending on its rupture; that in his opinion the rupture occurred on the morning of the paralysis; that no hemorrhage followed immediately upon the accident, though that is possible; and that the aneurysm in this case existed before, and more than thirty days before, the accident; that, in his opinion, the shock from the accident in this case did not cause the cerebral hemorrhage; that sclerosis of the arteries is common, and people that have it can live to a ripe old age, even with an aneurysm.

Dr. Hillkowitz, witness for the defendant, testified that he found that the deceased had been suffering from certain diseased conditions, namely, arteriosclerosis and

an aneurysm; that the cause of the death of the deceased was hemorrhage in an aneurysm of the basilar artery; that there was evidence of calcification in the arteries, which must have lasted from five or six years, and which could have caused the mental condition of deceased immediately after the accident; that the aneurysm must have existed for five or six months or a year before the accident and that it was not caused by the accident; that whether the rupture was caused by the accident is speculative; that it, the rupture, might have been very small at first, gradually increasing over a period of days; that from the evidence which he had heard, it might have been started at the time of the automobile accident. After stating that he could not say whether the automobile accident caused the rupture or not, and that the aneurysm was the ''primary'' cause of death, he further testified that an aneurysm does not always rupture. And the following appears in the record: ''Q. So that in this instance the traumatic shock as a result of this injury was doubtless the efficient cause of rupture? A. Yes.'' The question seems to refer to the automobile accident, but the point is not quite clear.

The case is one of first impression in this jurisdiction, and we have, therefore, without going into too many details, not only set out the most salient facts appearing in the evidence, but have also deemed it advisable to briefly take note of the leading cases that have been decided under policies similar to that involved in the case at bar. Counsel for the defendant, to sustain their contention, have cited us to the cases which contain the statement that if the deceased, at the time of the accident, was afflicted with a pre-existing disease, and if death would not have resulted if he had not had the disease, but his death was caused because the accident aggravated the effects of the disease or the disease aggravated the effects

of the accident, then no recovery can be had on an accident policy similar to that contained in the case at bar. The statement seems originally to have been made by Judge Sanborn in the case of National Masonic Acc. Assn. v. Shyrock, (C. C. A.) 73 Fed. 774. It was adopted as the rule in a number of other cases. Commercial Trav. Mut. Acc. Assn. v. Fulton, (C. C. A.) 79 Fed. 423; Aetna L. Ins. Co. v. Ryan, (C. C. A.) 255 Fed. 483; Kerns v. Aetna L. Ins. Co., (C. C. A.) 291 Fed. 292; Maryland Co. v. Morrow, (C. C. A.) 213 Fed. 599, 52 L. R. A. (N. S.) 1213; White v. L. & Acc. Ins. Co., 95 Minn. 77, 103 N. W. 735, 884, 5 Ann. Cas. 83; Ryan v. Continental Casualty Co., (C. C. A.) 47 Fed. (2d) 472; See note 34 L. R. A. N. S. 445. Taking the statement literally and without qualification, and in its apparently broad sense, it seems to be in conflict with the class of cases hereinafter mentioned which distinguish between proximate and remote cause, and which substantially hold that if the disease, or infirmity, is but a remote cause, recovery will not be prevented. In Wheeler v. Fid. & Cas. Co., 298 Missouri 619, 641, it is said that the conflict is apparent rather than real, as shown by an analysis of the cases, and that, perhaps, is true, at least as to most of them, although it may be that some of the courts have been stricter than others in holding a cause a proximate rather than a remote cause. The cases cited by defendant, and above set out, generally disclose that the subject of remote and proximate cause was not discussed. Furthermore, no adequate accident to produce the injury had generally been shown, or the point was doubtful, or it appeared clearly that the disease substantially contributed to the death. The same thing is true with reference to a number of other cases relied on by the defendant, though they do not state the law as in the cases heretofore mentioned. Atherton v. Railway Mail Assn., (Mo. App.) 221 S. W. 752; Phillips v. Traveler's Ins. Co.,

288 Mo. 175, 231 S. W. 947, 948; Johnson v. Aetna Life Ins. Co., 24 Ga. App. 431, 101 S. E. 134; Merrett v. Masonic Mut. Acc. Assn., 98 Mich. 338, 57 N. W. 169; Binder v. Masonic Acc. Assn., 127 Iowa 125, 102 N. W. 190; Stanton v. Travelers' Ins. Co., 83 Conn. 708, 78 Atl. 317, 34 L. R. A. N. S. 445; Travelers' Ins. Co. v. Selden, 78 Fed. 285; Kellner v. Trav. Ins. Co., 180 Cal. 326, 181 Pac. 161; Michener v. Fid. & Cas. Co., 200 Ia. 476, 203 N. W. 14; Brown v. Maryland Cas. Co., (C. C. A.) 55 Fed. (2d) 159; Cretney v. Woodmen Acc. Co., 196 Wis. 29, 219 N. W. 448; Frerichs v. Indemnity Co., 169 La. 182, 124 So. 821.

In the Shyrock case, for instance, deceased had been very ill before; the existence of an accident, adequate to produce the injury, was doubtful. In the White case it was shown conclusively that diabetes contributed substantially to the death of the decedent. The other cases exhibit a similar situation. The courts were doubtless influenced by the facts before them in stating the law, and a discussion of remote and proximate cause was evidently deemed to be superfluous. Without attempting any further analysis, we do not deem these cases determinative of the case at bar. New Amsterdam Casualty Co. v. Shields, 155 Fed. 54, contains language which, literally construed, tends to support the claim of defendant herein. But recovery was permitted in that case; the question of proximate and remote cause was not discussed, and we do not deem the case controlling herein. Counsel for defendant think that Brown v. Maryland Casualty Co., 55 Fed. (2d) 159, 160, is on all fours with the case at bar. We do not think so. In that case the deceased had been pushed back on a bed. Immediately thereafter it was discovered that there was a protrusion of the abdomen, but it was not shown that it did not exist previously. The court held that "there was nothing in the nature of the accident to carry with it a presumption that it caused any serious

injury''; further, that no basic facts had been shown from which the jury might have inferred that the death resulted from the push given the deceased, and that certain facts had been apparently studiously suppressed. We do not think that the case can be called in point, for plaintiff in the case at bar showed all the basic facts possible, including the condition of health of the deceased immediately prior to the accident; the accident in question was of an entirely different nature, and we are not warranted in saying, as a matter of law, that it was not such as to permit the jury to draw the inference that it resulted in serious injury and death.

The case of Railway Mail Assn. v. Weir, 24 Ohio App. 5, 156 N. E. 921, strongly relied on by defendant, in which the court appears to approve of the rule as stated by Judge Sanborn, is, we think, also distinguishable from the case at bar. The policy in that case provided that there should be no liability if disease or bodily infirmity were a contributing cause, or unless the accident produced visible external marks of injury or violence. No such external marks appeared. The court said that there was no evidence tending to show that the shock received by the deceased in an automobile accident, seemingly not violent, caused death. And it is apparent from the case that the court was of opinion that the accident was not of that nature which was adequate or sufficient to produce death, or had grave doubts on that point, and in any event it was clear that a pre-existing disease of the decedent at least contributed to death in a substantial manner. The policy in the case of Ackerman v. Minnesota Commercial Men's Association, 184 Minn. 522, 239 N. W. 229, was similar to that in the preceding case, and the facts in that case showed that, in all probability, there was no accident, but that the deceased died of heart disease.

There is another line of cases which, as already stated, make a distinction between proximate and remote cause,

and hold, substantially, that the remote cause will not prevent recovery, or that, in case of doubt, whether an existing disease or infirmity is a remote or proximate cause, the case is one for the jury. The foundation upon which these cases are built is the rule of proximate cause. That rule was expressed by Watkin Williams, J., in Lawrence v. Acc. Ins. Co., 7 L. R. Q. B. D. 216, in 1881, as follows:

"Lord Bacon's language in his Maxims of the Law, Reg. 1, runs thus: 'It were infinite for the law to consider the causes of causes, and their impulsions one of another; therefore it contenteth itself with the immediate cause.' Therefore, I say according to the true principle of law, we must look at only the immediate and proximate cause of death, and it seems to me to be impracticable to go back to cause upon cause, which would lead us back ultimately to the birth of the person, for if he had never been born the accident would not have happened. The true meaning of this proviso is that if the death arose from a fit, then the company are not liable, even though accidental injury contributed to the death in the sense that they were both causes, which operated jointly in causing it. That is the meaning in my opinion of this proviso. But it is essential to that construction that it should be made out that the fit was a cause in the sense of being the proximate and immediate cause of the death, before the company are exonerated, and it is not the less so, because you can shew that another cause intervened and assisted in the causation."

The rule was also stated in Freeman v. Mut. Acc. Assn., 156 Mass. 351, 30 N. E. 1013, 1014, 17 L. R. A. 753 as follows:

"Where different forces and conditions concur in producing a result, it is often difficult to determine which is properly to be considered the cause, and in dealing with such cases the maxim, *causa proxima non remota spectatur,* is applied. But this does not mean that the cause or condition which is nearest in time or space to the result is

necessarily to be deemed the proximate cause. It means that the law will not go further back in the line of causation than to find the active, efficient, procuring cause, of which the event under consideration is a natural and probable consequence, in view of the existing circumstances and conditions. The law does not consider the cause of causes beyond seeking the efficient, predominant cause, which, following it no further than those consequences that might have been anticipated as not unlikely to result from it, has produced the effect. An injury which might naturally produce death in a person of a certain temperament or state of health is the cause of his death, if he dies by reason of it, even if he would not have died if his temperament or previous health had been different; and this is so as well when death comes through the medium of a disease directly induced by the injury as when the injury immediately interrupts the vital processes.''

In reading the cases on this subject, perhaps a distinction should be observed between the rule of Arkansas and Alabama on the one hand and the rule in other states (except as noted) on the other. In the two states named, it is held that if the accident accelerates death, it must be held to be the proximate, and the sole cause of death. ''In other words, if death would not have occurred when it did but for the injury resulting from the accident, it was the direct, independent, and exclusive cause of death at that time, even though the death was hastened by the diseased condition.'' Fid. & Cas. Co. v. Meyer, 106 Ark. 91, 152 S. W. 995, 997, 44 L. R. A. N. S. 493; Benefit Assn. v. Armbruster, 217 Ala. 282, Id. 224 Ala. 302, 140 So. 356, and other Alabama cases herein cited. In the Armbruster case, for instance, the deceased was suffering from acute appendicitis. Apparently, while being taken to a hospital to be operated on for that disease, he accidentally fell, causing the appendix to burst and he died. Recovery was permitted. The case of Sturm v. Assur. Corp., 212 Ill. App. 354, seems to be to the same effect. The question there was

whether or not a pre-existing disease caused the deceased to be drowned in a bath tub. The court said:

"Even though the insured were diseased and his abnormal condition led to his falling into the water and being drowned—and so in a sense contributed to his death —it is not the law that that contribution of disease to his death would prevent the plaintiff from recovering. The law distinguishes between so-called successive causes as between physical conditions; and the proximate excludes the more remote. If the deceased came to his death by drowning, then, legally, that was the sole cause of his death."

In one sense at least, the conclusion drawn by these courts cannot be called illogical, and there can be no doubt that if the rule of these cases is correct, the verdict in the case at bar is sustained by ample testimony. But it is said that these cases are not in point, for the reason that the policy involved therein was not like that in the case at bar, containing only the clause that the deceased was insured "against bodily injuries sustained through accidental means resulting directly, independently and exclusively of all other causes of death," while the policy in question here goes farther. Counsel say that in the Meyer case, supra (and Benefit Assn. v. Armbruster, 217 Ala. 282, 116 So. 164,) the court distinguishes between the policy there in question and one that contains the additional clause, excepting liability where death has resulted "wholly or in part, directly or indirectly, from disease or bodily infirmity" the court saying in the Meyer case that this refers to a contributing cause whether proximate or remote. In Kerns v. Aetna Life Insurance Co., (C. C. A.) 291 Fed. 289, 292, on the other hand, it was said that "it is difficult, if not impossible, to eke out any legal distinction between death which results directly and independently of all other causes and death caused wholly or in part from disease or bodily infirmity." The same

opinion is expressed in Kirkwood v. London etc. Co., 14 L. App. 438, 440. That might be correct, if the policy contains nothing to indicate the contrary. The policy in the case at bar makes the point doubtful. Counsel is mistaken in thinking that the policy in the case at bar is like that sought to be distinguished in the Arkansas case. It provides that double indemnity shall not be paid, if death results directly or indirectly, *wholly or partly*, from war, riot, etc. The clause "wholly or partly" is left out in the clause that double indemnity shall not be paid in case of death "resulting directly or indirectly from bodily or mental infirmity." The policy evidently contemplates a difference in these situations. Death caused indirectly by bodily infirmity is not, under this policy at least, deemed to be the same as death caused *partly* thereby. In the latter case several concurring, proximate, causes of death may exist. The clause that double indemnity will not be allowed in case of death "resulting directly or indirectly from bodily or mental infirmity," leaving out, as it does, the words "wholly or partly," seems, in contradistinction, to refer to but one cause, and that the predominant and not merely a contributing cause. Hence we are not prepared to say that the policy involved in the case at bar is, in effect, materially different from that involved in the Alabama and Arkansas cases. We do not, however, deem it necessary in the case at bar to go as far as those cases.

Other cases do not, perhaps, go quite as far as the Arkansas and Alabama cases, but at the same time hold that in order that a bodily infirmity may defeat a claim for double compensation, or for damages caused by accident, it must be the proximate cause or one of the proximate causes of the death, and that in order that it may be so considered, it must be of a substantial nature, and must be more than merely a condition. Thus it was said in Thornton v. Travelers Insurance Co., 116 Ga. 121, 125, 42 S. E. 287, 288, 294 Am. St. Rep. 99:

"But if the existence of the hernia in the system of the insured at the time of the accident did not substantially contribute wholly or partly, directly or indirectly, in bringing about the injury, but merely aggravated the consequences of the accident, then the plaintiff would be entitled to recover."

In Driskell v. Insurance Co., 117 Mo. App. 362, 369, 93 S. W. 880, 882, the court said:

"If, under the peculiar temperament or condition of health of an individual upon whom it is inflicted, such injury appears as the active, efficient cause that sets in motion agencies that result in death, without the intervention of any other independent force, then it should be regarded as the sole and proximate cause of death. The fact that the physical infirmity of the victim may be a necessary condition to that result does not deprive the injury of its distinction as the sole producing cause. In such case, disease or low vitality do not arise to the dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury."

This statement was approved by the Supreme Court of Missouri in the case of Wheeler v. Fidelity & Casualty Co., 298 Mo. 619, 642, 251 S. W. 924. And in the case of Fetter v. Fidelity and Casualty Co., 174 Mo. 256, 73 S. W. 592, 61 L. R. A. 459, in which the deceased accidentally ruptured his kidney, producing hemorrhage and death, it was held that though deceased was afflicted with cancer, which was a predisposing cause of the rupture, but only a remote cause, recovery might be had. See also Beckerleg v. Life & Acc. Assn., (Mo.) 274 S. W. 917.

In the recent case of Runyon v. Casualty Co., 9 N. J. Misc. 487, 154 Atl. 397, in which the decedent died as a result of a broken hip, it was said:

"There is testimony from which the jury could have found that paralysis agitans was, with Mr. Runyon, an incurable malady which would have remained with him throughout his life, but would not cause death; that the presence of the ailment had, at the time of the accident, lessened the resisting power of the body  *  *  * . With the case in such a posture, the jury could have found that the only contribution of the paralysis to the death was a reduction in the power of the body at the time of the fracture to resist the shock.  *  *  *  During the life of the policy, the assured was injured, and died as the result of the injury. His death was not the culmination of two parallel or participating causes, of which disease was one and accident was the other; nor was it the result of one of these accentuated or made more acute by the other. It was the direct result of the accident, which might or might not have been fatal had not the bodily vitality been impaired. The accident caught him as he was and laid him low. Against that we think he was insured; otherwise there could be no recovery in any case of death by accident where the victim, had he been posessed of perfect health, might have successfully combatted the ravaging ills that follow immediately in the wake of physical crash."

In the case of Continental Casualty Co. v. Lloyd, 165 Ind. 52, 73 N. E. 824, 827, the deceased died of cerebral hemorrhage, following a severe fall. A post-mortem examination disclosed that the deceased was afflicted with a tumor surrounding the cerebral artery, and it was contended that this tumor and not the fall was the cause of the hemorrhage. The court said among other things:

"It (the jury) had the right to find that the accidental fall was the cause that put his life in jeopardy, because it incited the fatal energy of the tumor, which was at least dormant, and would have remained so for an indefinite period, and, perhaps, until death from some other cause would have supervened. The tumor had impaired the resisting strength of the artery, but had not effected immediate danger to life. It was proper under the evidence for

the jury to view the impairment as a condition, and not as a cause, and to find that the fall was the originating, efficient, direct and proximate cause of death; that is, that the fall set in motion a force that progressed upon present existing conditions in natural, usual sequence to effect the fatal result. * * * Who knows that the artery would not have been ruptured by the fall if it had been in a normal condition? Or who can tell that the insured would not have died from some other cause if the fall had not animated and accelerated the energy of the tumor? * * * From these considerations it seems clear that the jury, in its search for the proximate cause of death, had the right to conclude that even though the fall would not have produced death but for the impaired artery, the tumor at most was a remote, and not a proximate efficient cause.''

In Silverstein v. Metropolitan Life Ins. Co., 254 N. Y. 81, 171 N. E. 914, the question was whether or not a duodenal ulcer was a contributing cause to a perforation of the stomach and consequent death. The court said in part:

''We think the evidence sustains a finding that the ulcer was not a disease or an infirmity within the meaning of the policy. Left to itself, it would have been as harmless as a pimple or a tiny scratch. Only in the event that it was progressive would it become a source of pain or trouble. If dormant, as it was found to be, it was not only harmless in itself, but incapable of becoming harmful except through catastrophic causes, not commonly to be expected. In a strict or literal sense, any departure from an ideal or perfect norm of health is a disease or an infirmity. Something more, however, must be shown to exclude the effects of accident from the coverage of a policy. The disease or the infirmity must be so considerable or significant that it would be characterized as disease or infirmity in the common speech of man. * * * 'If there is no active disease, but merely a frail general condition, so that powers of resistance are easily overcome, or merely a tendency to disease which is started up and made operative, whereby death results, then there may be recovery

even though the accident would not have caused that effect upon a healthy person in a normal state.' Leland v. Order of United Commercial Travelers of America, supra, at page 564 of 233 Mass., 124 N. E. 517, 520. * * * Any different construction would reduce the policy and its coverage to contradiction and absurdity. The infinite interplay of causes makes it impossible to segregate any single cause as operative at any time and place to the exclusion of all others, if cause is to be viewed as a concept of science or philosophy. * * * The courts have set their faces against a view so doctrinaire, an estimate of intention so headed toward futility. 'We are to follow the chain of causation so far, and so far only, as the parties meant that we should follow it. The causes within their contemplation are the only causes that concern us.' "

In Cretney v. Woodmen Acc. Co., 196 Wisc. 29, 219 N. W. 448, 450, 62 A. L. R. 675, which contains language seemingly sustaining the contention of defendant herein, it was also said:

"The holding here does not mean that a man must be in perfect physical health in order that there may be a recovery on an accident policy such as the one in suit here. A man insured may be in advanced years, he may be suffering from some disease which has weakened his resistance, yet he may be the victim of an accident which is the sole cause of his death, although death might have been less likely had he been in better physical condition."

Similar, in effect, are the following cases: Miller v. Fidelity & Casualty Co., (C. C.) 97 Fed. 836; Mutual Life Ins. Co. v. Dodge, (C. C. A.) 11 Fed. (2d) 486, 59 A. L. R. 1290; Patterson v. Ocean A. & G. Co., 25 D. C. App. 46; Modern Woodmen Acc. Assn. v. Shyrock, 54 Nebr. 250, 74 N. W. 607, 39 L. R. A. 826 (where the statement of the law by Judge Sanborn was disapproved). See also Aetna Life Ins. Co. v. Bethel, 140 Ky. 609, 131 S. W. 523.

A policy of insurance should not, of course, be so strictly construed as to thwart the general object of the insur-

ance. To do so would, in the long run, subserve the purposes neither of insurers nor insured. It can hardly be assumed, in the absence of a contract clearly to the contrary, that the parties to the contract meant to have the double indemnity, or any other provision for cases of accident, apply only in case the insured is in perfect health at the time of the accident. If courts made such an assumption under an ordinary contract such as that involved in the case at bar, all accident insurance would probably soon be a matter of the past. But counsel for the defendant assert that in view of the facts in this case, no recovery can be had herein under any of the authorities. We do not so construe them. Counsel's claim that no recovery should be permitted herein would, doubtless, be valid, if it were conceded that any bodily infirmity which, from a scientific standpoint, contributes to the death, would have that effect under the terms of the contract, and that is virtually what counsel, upon ultimate analysis, insist on. They apparently overlook the difference between proximate cause on the one hand, and remote cause or a condition on the other, as recognized in law, not bearing in mind, seemingly, that a contributing cause from a scientific standpoint is not necessarily a proximately contributing cause from a legal standpoint. Silverstein v. Metropolitan Life Insurance Co., supra. The foregoing cases as a whole, or at least many of them, all dealing with policies similar to that in the case at bar, clearly show, we think, that, in solving the problem before us, we cannot overlook the distinction between proximate and remote cause, and that if a disease, bodily infirmity, or predisposing cause in fact existed, as claimed, still unless it can be said to be one of the proximate causes instead of only the remote cause or condition, recovery should not, on that account, be denied. We said in Lemos v. Madden, 28 Wyo. 1, 10, 12, 16, 200 Pac. 791, that proxi-

mate cause is probable cause, and remote cause is improbable cause; that the mere fact that one cause may in point of time concur with another, does not necessarily show that it is an efficient cause, and may still be considered a remote cause, and that a cause may, in law, be a remote cause, notwithstanding the fact that, but for its existence, no injury would have occurred. It is, of course, frequently difficult to determine whether an existing factor should be considered as a condition, or remote cause, rather than a proximate cause. The criterion laid down by some of the courts is, as above noted, as to whether it can be said to have been a substantially contributing cause. That is in line with section 306 of the Restatement of the Law of Torts of the American Law Institute, wherein it is said that certain conduct is a cause of another's injury if it is a substantial factor in bringing such injury about. In Eberhardt v. Tel. Assn., 91 Kans. 763, 139 Pac. 416, 417, quoted from in Lemos v. Madden, it was said:

"A condition which could not reasonably be expected to endanger, and which but for some independent cause without which the injury would not have occurred would not have endangered, does not ordinarily amount to a proximate cause."

And in case of doubt, under the evidence, the question must be left to the jury. Continental Casualty Company v. Lloyd, 165 Ind. 52, 60, 73 N. E. 824; Modern Woodmen etc. Assn. v. Shyrock, 54 Nebr. 250, 74 N. W. 607, 39 L. R. A. 826, 22 R. C. L. 148, 149; Green, Rationale of Proximate Cause, 143, 144.

In the case at bar the accident, as well as the cause of the death, are shown by the evidence. Counsel for the defendant argue that the diseased condition of the deceased may have caused him to go off the road. But we think that it was at least a question for the jury whether

that was true. Our attention is called to the testimony of Dr. Kamp, fortified by that of Dr. Hillkowitz, that the decedent's going off the road, as well as his mental condition subsequently, might have been caused by reason of the decedent's arteriosclerosis. But Dr. McClellan was positive that arteriosclerosis had nothing whatever to do with the decedent's death, and this would seem to include the stages preliminary to death. Nor can we overlook the testimony of Dr. O'Connor and Dr. Replogle that the blood pressure of the deceased, indicative of the presence or absence of arteriosclerosis, was normal during the decedent's life time. Furthermore, there was evidence indicating that the accident was caused by reason of another car "crowding" the car of the deceased. So too, we think, there was sufficient evidence for the jury to determine whether the accident was such as to cause, or was the sole proximate cause of, the injury of which the decedent died. Doctors Replogle and McClellan so testified. And, as already stated, we cannot say as a matter of law that the facts in this case—the automobile plunging down a steep and deep embankment and against rocks—do not show an accident adequate and sufficient to produce the injury resulting in death. Even Dr. Kamp, defendant's witness, admitted that "hemorrhage of the brain from existing aneurysm perhaps would be caused from shock from running off the road." And, as we read the evidence, the testimony of Dr. Hillkowitz is not clear as to what was the "primary" or "efficient" cause of death. These matters were, we think, a proper subject for medical opinion. U. S. Casualty Co. v. Thrush, 21 Oh. App. 129, 152 N. E. 796. Dr. McClellan, it is true, stated, on cross-examination, that the aneurysm contributed to the death. Scientifically speaking, he was doubtless correct. There is no such thing as a sole cause, from a scientific standpoint, and the doctor might well have added a number of other

causes which were contributing causes from that standpoint. Taking his testimony as a whole, however, it evidently was his opinion that, from a legal standpoint, the aneurysm was a condition rather than a proximate cause. Dr. Replogle stated it as his opinion that the rupture at first was small. In this he appears to be corroborated by Dr. Hillkowitz, though his testimony was not quite as clear as could be wished. This, too, we think, was a proper subject for medical opinion, based as it was upon observation of deceased for several days and upon the condition of the deceased immediately after the accident. Similar testimony was given in the case of Jefferson Standard Life Ins. Co. v. Lightsey, 49 Fed. (2d) 586. And we cannot say that the correctness of that opinion is improbable, though we do not attribute the same importance to it as counsel for the defendant; nor do we think that it can properly be said that inference has, in this case, been sought to be built upon inference. The rupture was at the place of the aneurysm. If that aneurysm was caused by the accident, then the accident was, or could, under the evidence, be found to be, the sole cause of the death within the meaning of the policy. Corsones v. Acc. Ins. Co., 103 Vt. 323, 154 Atl. 693. There is some evidence that the aneurysm might have been so caused; that a traumatic shock, syphilis or localized infection—mostly the two former—may cause it. Decedent had no syphilis, and while there is some evidence that glaucoma has some connection with arteriosclerosis, we take it that it is not claimed that any localized infection caused the aneurysm, so that, seemingly, according to Dr. O'Connor's testimony, the aneurysm in the case at bar was caused by traumatic shock. If it was so caused, it is difficult to see, how it could then be called an infirmity or disease, unless, perchance, some other infirmity or disease contributed substantially in producing it. But such other infirmity or disease could not,

in the case at bar, be anything else than arteriosclerosis, and Dr. McClellan was positive that that had nothing whatever to do with decedent's death. However, the evidence as to whether traumatic shock incident to the automobile accident caused the aneurysm is not, perhaps, in view of the testimony of Dr. Kamp and Dr. Hillkowitz, as satisfactory as it might be, and we need not, we think, lay stress on it. Even if the aneurysm existed at the time of the accident, and may be considered an infirmity, that would not, necessarily, bar recovery. If it was dormant (and that is what Dr. McClellan evidently meant when he said that it was latent), and the deceased would have lived out his normal life, which, according to Dr. McClellan, is probable, and which is not, directly at least, disputed by any other witness, then its existence should not, we think, bar recovery herein. It could not, in that event, be reasonably said, we think, that the accident was not the sole cause of death, independent of any other cause, or that the infirmity was such as substantially and materially contributed to the death, so as to be considered as a proximate cause. In the Alabama and Arkansas cases, cited above, it was held, as already shown, that if an accident acclerates death, recovery may be had. In United States Casualty Co. v. Thrush, supra, recovery was permitted in a case where it appeared that the deceased, notwithstanding his sclerosis, would, but for the accident, probably have lived ten years longer. In Moon v. Order of United Commercial Travelers, 96 Nebr. 65, 146 N. W. 1037, 52 L. R. A. N. S. 1203, it was said that if, but for the accident, the deceased would have lived many years, the accident preceding the death should be held to be the proximate cause of the death, notwithstanding that the arteries had become weakened by sclerosis. Surely that should not any the less be true in a case where the deceased would, but for the accident, have probably lived out his

normal life, and the fact that the aneurysm tended to cause the artery to rupture more easily, should not in that case, as shown by many of the cases herein cited, make any difference. There is testimony in the record that an aneurysm may be ruptured easily, even by turning over in bed. Great stress is laid in the argument on that point. We do not understand the testimony to mean that this is true in every case. In fact such conclusion would be inconsistent with at least the testimony of Dr. McClellan when considered as a whole. Recovery has been permitted in other cases where an aneurysm has been shown to have existed. Order of United Commercial Travelers v. Etchen, 27 Ohio App. 422, 162 N. E. 636. The jury were warranted, we think, in view of the testimony, in finding that the aneurysm in the case at bar was not of the character above mentioned. The case was one, we think, for the jury to decide upon conflicting testimony.

Counsel for the defendant asked the court to submit special interrogatories to the jury, which the court declined to do. The issues herein were simple, in fact the only vital issue was confined to one point, namely, whether or not the aneurysm contributed to or was the cause of the injury of which decedent died, in the sense heretofore pointed out. The court fully instructed the jury on that point, and we cannot say that under the circumstances the court abused its discretion. Opitz v. Newcastle, 35 Wyo. 358, 249 Pac. 799; Wallace v. Skinner, 15 Wyo. 233, 88 Pac. 221; Giffen v. Lewiston, 6 Idaho 231, 55 Pac. 545.

The judgment herein must accordingly be affirmed, and it is so ordered.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.