## McCARTY

v.

### OCCIDENTAL LIFE INS. CO. OF CAL.

No. 35710.

Supreme Court of Oklahoma.

Feb. 16, 1954.

Rehearing Denied March 23, 1954.

Fred M. Black, H. M. Redwine, Oklahoma City, for plaintiff in error.

Embry, Johnson, Crowe, Tolbert & Boxley, by Ben L. Burdick, Oklahoma City, for defendant in error.

CORN, Justice.

Marvin D. McCarty, hereafter referred to as the deceased, was an employe of the Oklahoma City Livestock Exchange, which carried a group insurance policy, issued by defendant, covering its employees. This policy provided for payment in event of accident or sickness, accidental death or dismemberment, and other benefits not material herein. The policy provision relative to accidental death was as follows:

"If the individual while insured hereunder suffers directly and independently of all other causes, bodily injury effected solely through external, violent, and accidental means which results in any of the losses enumerated below within ninety days after the date of the accident causing the loss, the

Company shall pay for such loss, subject to the following provisions:

* * * * * *

"(f) No amount of insurance shall be payable if the individual's loss shall directly or indirectly, wholly or partly, result from * * * (3) bodily or mental infirmity, disease of any kind, or as a result of medical or surgical treatment therefor; or (4) the Commission of or the attempt to commit an assault or felony by the individual; or, * * *."

In November, 1951, plaintiff, as guardian in behalf of the named minors, filed suit alleging deceased died as the result of injuries sustained August 8, 1951, from blows received when assaulted by one Wooley. Further, that his death was effected solely through external, violent and accidental means within the meaning of the policy provision covering accidental death. Plaintiff asked judgment for $2500, the face amount of the policy.

Defendant answered by pleading the terms of the policy, and made a general denial. Defendant then alleged that since birth deceased had suffered from a congenital arterial aneurysm, which constituted a bodily infirmity within the above quoted exclusion clause (f–3) of the policy, and that death had resulted from a basilar and subarachnoid hemorrhage due to such condition, so that defendant was not liable under the terms of the policy. The defenses alleged in the answer were set up as follows:

4. At the time of death deceased was in the act of attempting to commit an assault which under provision f–4 of the policy relieved defendant from liability.

5. Since birth deceased had suffered from congenital arterial aneurysm, a severe bodily infirmity, and death had resulted from hemorrhage due to such condition, liability therefor being excluded under provision f–3 of policy.

6. Deceased died from natural causes within meaning of terms of the policy.

7. Deceased was intoxicated and deliberately became involved in altercation so that death was not effected solely through violent, external accidental means and in-

dependent of all other causes as provided under the policy.

The principal issue was under paragraph 5, as to whether death resulted from bodily injury effected solely by violent, external, accidental means, or whether it resulted wholly, or in part, from bodily infirmity or disease.

Plaintiff's evidence disclosed deceased was occupying a room in a hotel the night of his death. The hotel landlady was asked to call an ambulance, which she did. She then went to deceased's room, and found him lying on the floor, apparently dead. The room was in an orderly condition. A blackjack was found under the bed later, and turned over to the police.

Another witness had parked his car across the street from the hotel, and joined a group of persons watching a fight which was taking place in a room of the hotel facing the street. This witness and another man located an officer, and also called the police station. Two men were fighting in the room, and a woman was present, but not a participant in the altercation. One of the men was down most of the time, and could be heard asking for help.

The police officer who went to deceased's room testified that he found deceased upon the floor, and that there were bruises on his face. A short time before this he had seen deceased, in company with Wooley and a woman, and no bruises were visible on deceased at that time. The blackjack found in the room was turned over to witness.

The officer in charge of the homicide division of the police force testified he was called to the hotel and there examined deceased. There were bruises upon his face and body, and his elbows were skinned, but examination of the hands and shoes of both Wooley and deceased revealed neither abrasions nor blood indicating a fight.

Deceased's father testified they had worked together for years; that deceased always had enjoyed good heath, had never suffered any serious illness, and was in good health the day of his death. After presentation of this evidence plaintiff rested.

Defendant's demurrer to plaintiff's evidence was overruled. Defendant then presented the evidence of the neurosurgeon who performed a total autopsy on the body of deceased the day following death. In performance of the autopsy the doctor made a complete examination of the body, particularly the skull and brain. This revealed extensive bleeding on the floor of the skull, and blood clotting extending downward into the spinal canal. There was no skull fracture, or evidence of traumatic injury to the brain. However, near the base of the skull, near a point where the parietal artery bifurcates, there was an irregular area with a blood clot firmly attached, and an opening into the blood vessel from which such bleeding had occurred. Upon the autopsy findings witness concluded deceased had suffered from an aneurysm which had existed since birth. In ordinary parlance an aneurysm may be compared to an automobile innertube which had a weak spot which gradually enlarges until eventually the stress becomes too great and a blowout occurs. The most frequent cause of such condition is congenital. The aneurysm or dilatation of the blood vessel finally ruptured, the resultant bleeding caused pressure upon vital areas of the brain, particularly the portion of the brain controlling respiration, and deceased died of medullary failure, which caused him to cease breathing. Based upon the autopsy findings the witness concluded deceased was suffering from a congenital aneurysm.

On cross-examination witness testified it was his opinion any blow deceased received had nothing to do with rupture of the aneurysm. The autopsy report, which was read in evidence was as follows:

"There was no abnormality of the scalp, temporal muscle or calvarium of the skull. The dura was intact, and not abnormal. The cerebral hemisphere were the usual size and shape. The convolutions and sulci were of normal size. There was a great amount of subarachnoid hemorrhage over the hemisphered, and in the sulci greater on the left. On examining the base of the brain, there was a large

clot in the region of the circle of Willis, extending through the foramen magna into the vertebral canal; the clot had also extended into the left Sylvian fissure along the middle cerebral artery. At the junction of the anterior middle cerebral artery on the left, the clot adherred more firmly and there was some irregularity of the wall, which is compatible with an aneurysm. There was gross softening of the pons and medulla, there was no hemorrhage into the ventricle. The dural sinuses were all intact. The dura was then stripped from the base of the skull, and a negative search was made for evidence of fracture or other trauma. There was no evidence of cranial or intra-cranial trauma."

At the conclusion of the foregoing evidence defendant rested. Plaintiff introduced in rebuttal the testimony of a physician who had reviewed the autopsy report, and had heard the testimony given by defendant's witness. He testified all aneurysms are different, vary in every individual, and many persons suffering therefrom live to old age. An unruptured aneurysm is not a disabling infirmity, and does not bother a person. In response to a hypothetical question based upon matters disclosed by plaintiff's evidence, this witness testified in his opinion the blows deceased received in the fight caused his death; that it was possible the autopsy surgeon made a mistake in his examination; he did not understand how presence of an aneurysm in a man as young as the deceased could be determined without a microscopic examination of the ruptured blood vessel or artery; he doubted anyone's ability to definitely ascertain existence of an aneurysm, in the area where it was determined deceased had such condition, without a microscopic examination, unless it was very large. One suffering from an aneurysm is more likely to suffer hemorrhage from a blow than a person without such condition, and it could result from a sudden jar without necessity of suffering a blow. In this witness' opinion it was the blows deceased received that precipitated rupture of the artery resulting in death.

Thereafter plaintiff sought to introduce in evidence copies of Selective Service records purporting to show deceased's physical fitness for military service and lack of serious bodily ailments or mental infirmities in 1945. The refusal to admit such records in evidence is one of the errors presented for consideration on appeal.

Subsequently defendant presented additional testimony of the autopsy surgeon, as well as that of another physician who assisted in the autopsy. The substance of their testimony was that they were able to ascertain the existence of an aneurysm in deceased without necessity of a microscopic examination, and that the findings clearly revealed that deceased died as a result of pressure on vital areas of the brain which directly resulted from a hemorrhage due to rupture of the aneurysm.

At the close of all the testimony defendant's motion for a directed verdict was overruled. The case was submitted to the jury under instructions from the trial court and the jury returned a verdict for defendant, upon which the judgment appealed from was rendered.

Two propositions are presented as grounds for reversal of this judgment. Plaintiff contends the trial court erred in refusing to give two requested instructions, and that there were errors of law inherent in certain instructions given the jury. The substance of the two requested instructions may be stated as follows.

Requested instruction No. 2 asked the court to charge the jury defendant had the burden of establishing the affirmative defenses, to-wit: (1) that at the time of death deceased was attempting to commit an assault within the exclusion (f-4) provided by the policy; (2) that death resulted directly or indirectly, wholly or in part, from bodily or mental infirmity, disease, or medical treatment therefor. Further, a finding of either of the above by a preponderance of the evidence, entitled defendant to a verdict, while a finding to the contrary would entitle plaintiff to a verdict.

Requested instruction No. 7, in effect, was that the policy was a contract, and all common words and phrases used therein,

absent evidence to the contrary, were to be deemed to have been used by the parties in contemplation of their ordinary, customary and commonly accepted sense.

The two instructions given by the court and now alleged to contain inherent errors of law were as follows (No. 11 and No. 14):

"You are further instructed that in the event the jury should find from a preponderance of the evidence that the said McCarty's death was occasioned solely as the direct and proximate result of injuries sustained by the said McCarty in a fight or altercation between himself and one Wooley, as alleged by the plaintiff, then and in that event the burden of proof is upon the defendant to show by a preponderance of the evidence the affirmative defense contained in his answer that the fight or altercation between the deceased and said Wooley was voluntarily and deliberately occasioned and brought about by the acts of aggression of the deceased and that therefore his death was not effected solely through external, violent and accidental means, directly and independently of all other causes."

"You are instructed that if you should find and believe from a preponderance of the evidence herein that at the time and place alleged in plaintiff's petition, the plaintiff's decedent, Marvin D. McCarty, engaged in a fight or altercation with James Edward Wooley, and in said fight he sustained bodily injuries at the hands of the said Wooley, which directly and independently of all other causes, effected solely through external, violent and accidental means, resulted in his death, then and in that event you will find for the plaintiff and against the defendant, and you will fix the amount of plaintiff's recovery at the sum of $2,-500.00, with interest thereon at 6 per cent per annum from November 20, 1951, unless you should find for the defendant that said altercation or fight was voluntarily and intentionally provoked by the deceased, McCarty.

"You are instructed that should you find from a preponderance of the evidence that the fight and altercation between the deceased and the said Wooley was voluntarily and intentionally provoked by the deceased, McCarty, then and in that event, your verdict will be for the defendant that plaintiff take nothing.

"You are further instructed that should you find from the evidence in this case that the death of the said McCarty was not effected, directly and independently of all other causes, solely through external, violent and accidental means, but was occasioned in whole or in part by an aneurysm, as set out and alleged by the defendant, then and in that event your verdict will be for the defendant that plaintiff take nothing."

Plaintiff urges the burden of proof was upon defendant to establish affirmative defenses asserted under policy provisions "f–3 and f–4", although the court advised the jury defendant had the burden of proving the defense asserted under "f–4", it erred in not instructing that the same burden existed as to the defense plead under "f–3". The argument is that the contingencies set forth in these two policy provisions constitute exclusions from the accidental death benefits provisions, as distinguished from the conditions of liability contained in the policy. Thus, since both defenses asserted were under the policy provisions they constituted affirmative defenses as to which the court should have charged the jury defendant had the burden of proof.

Reference to the policy (quoted heretofore) reveals the defendant's conditions of liability (for dismemberment or accidental death) are that the company agrees to pay any insured who suffers, "directly and independently of all other causes, bodily injury effected solely through external, violent and accidental means," resulting in certain enumerated losses. Thereafter the policy provides a schedule of benefits, including payment to a named beneficiary in event of death.

We are unable to perceive the distinction sought to be drawn in this matter. The gist

of plaintiff's argument is that where, in an action to recover accidental death benefits under an insurance policy, the insurer denies liability on the ground the insured's death resulted not from accidental means, but directly or indirectly from bodily infirmity or disease, the insurer has asserted an affirmative defense and thereupon must assume the burden of proof.

We are of the opinion this argument is unsound, and that the applicable rule is expressed in Metropolitan Life Ins. Co. v. Rosier, 189 Okl. 448, 117 P.2d 793. Therein we had for consideration an ordinary life insurance policy which also contained a double indemnity clause covering accidental death, but which expressly excluded liability in the event of self-destruction. In an action to recover both for the face of the policy, and under the double indemnity clause, the insurer plead insured's death was not accidental, but resulted from a self-inflicted gunshot wound. The trial court placed the burden of proving the defense of suicide upon the insurer.

In reversing that judgment by reason of the trial court's error in requiring the insurer to assume the burden of proof, the difference in the perils insured against was considered. In that case we adopted the reasoning expressed in Dimmer v. Mutual Life Ins. Co., etc., 287 Mich. 168, 283 N. W. 16, wherein is pointed out that a difference exists between an action to recover death benefits, and an action to recover upon an accident policy or a double indemnity provision of an ordinary life policy, in that in both latter instances it is incumbent upon the plaintiff to establish the fact of accidental death.

Plaintiff's argument that because this is a different type of policy from that in the Rosier case, supra, satisfactorily distinguishes the matter and precludes application of the rule announced is not sound. In the present case the insurer contracted to pay in the event of accidental death. This being the condition of liability it was incumbent upon plaintiff to accept and discharge the burden of establishing death by accidental means. The defendant denied deceased died accidently, and this being the

issue recognized by the trial court, the rule above referred to properly was applied and the court was correct in refusing to give the requested instruction.

Further complaint is made that the court erred in refusing to give plaintiff's requested instruction No. 7 summarized heretofore. Plaintiff says such instruction was appropriate to the issue raised by the pleadings and evidence concerning the meaning of the term "bodily or mental infirmity" as used in the policy; and, that the court should have instructed that the contracting parties were deemed to have used such words in contemplation of their ordinary, usual and customary sense. We have held in numerous instances that it is not error for a trial court to refuse to give an instruction defining words of common understanding, such as are readily understood by persons of ordinary intelligence. Skaggs v. Gypsy Oil Co., 169 Okl. 209, 36 P.2d 865. Since it must be presumed that people of ordinary intelligence will consider words in the usual and ordinary manner to which they are accustomed, an instruction which purported to advise the jury this must be done would be no more than surplusage and would add nothing to the jury's knowledge.

Plaintiff also contends the trial court erred in giving instruction No. 14. Plaintiff argues the trial court assumed as a matter of law that an aneurysm constituted a bodily infirmity, as this term was understood by the contracting parties, although there was a sharp conflict in the evidence both as to whether deceased suffered from this condition, and whether such condition may be considered a serious bodily infirmity.

In 29 Am.Jur., Insurance, Sec. 995, the following statement is found:

"The words 'disease' and 'bodily infirmity' are frequently used in exceptions in accident insurance policies and double indemnity provisions and have a well-understood meaning. They are construed to be practically synonymous, and to refer only to some ailment or disorder of an established or settled character to which the insured is subject. * * *"

See Mutual Life Insurance Co. of New York v. Dodge, 4 Cir., 11 F.2d 486, 59 A.L.R. 1290; Taylor v. New York Life Ins. Co., 176 Minn. 171, 222 N.W. 912, 60 A.L.R. 959. See also First National Bank v. Equitable Life Assurance Society, 225 Ala. 586, 144 So. 451, holding that meningitis superinduced by rupture of old abscess was caused by "bodily infirmity"; and Bergeron v. Prudential Insurance Co., 96 N.H. 304, 75 A.2d 709, holding that pre-existing physical infirmity such as angina pectoris was a "bodily infirmity" within meaning of the accepted definition. Attention also is directed to an extended analysis of the question by Justice Cardozo in Silverstein v. Metropolitan Life Ins. Co., 254 N.Y. 81, 171 N.E. 914.

On cross-examination the autopsy surgeon stated he was not sure just how to define "serious infirmity", but that such infirmity probably would not impair ones ability to go about his daily affairs. In response to another question the surgeon stated an aneurysm might not be considered serious until after one rupture. This, together with the lack of evidence tending to show deceased had suffered a previous rupture or stroke, and certain conflicting medical testimony, is taken by plaintiff as sufficient to establish that an aneurysm cannot be considered a bodily infirmity.

 There was sufficient medical evidence from which the jury could determine that any individual suffering from such a condition had a bodily infirmity which easily could be the cause of death without prior indication of the cause thereof. It seems only practical to recognize that the presence of a condition or malformation in the human body sufficient to be the primary cause of death at any time and without previous warning, must in the normal course of reason be recognized and considered a severe bodily infirmity.

Plaintiff cites and relies upon numerous cases as supporting her position. The rule expressed in Druhl v. Equitable Life Assurance Soc., 56 N.D. 517, 218 N.W. 220, 60 A.L.R. 962, and Equitable Life Assurance Soc. v. Gratiot, 45 Wyo. 1, 14 P.2d 438, 82 A.L.R. 1397, is inapplicable in view of the contrary result reached by this court in Great Northern Life Ins. Co. v. Farmers' Union Co-op. Gin Co., 181 Okl. 370, 73 P. 2d 1155.

██ Plaintiff last contends it was reversible error for the trial court to refuse to admit copies of the Selective Service System records in evidence as showing deceased's physical fitness. We deem it unnecessary to consider this argument at length. The only effect of the proffered records would have been to establish deceased's apparent physical fitness in 1945, when such records were made. There was competent testimony to the effect deceased always had enjoyed good health and never had suffered serious illness. With this testimony already before the jury the proffered records would have been merely cumulative and would have added nothing to the evidence. It is only where alleged error in ruling on evidence cause a miscarriage of justice, or constitute substantial violation of a constitutional right that a jury verdict will be reversed upon such grounds. See Larkins-Warr Trust v. Watchhorn Pet. Co., 198 Okl. 12, 174 P.2d 589.

We are of the opinion the trial court properly instructed the jury as to the issues presented by the pleadings and the evidence, and no error was committed in the exclusion of plaintiff's proffered evidence.

Judgment affirmed.

HALLEY, C. J., JOHNSON, V. C. J., and DAVISON, O'NEAL, WILLIAMS and BLACKBIRD, JJ., concur.