METROPOLITAN LIFE INSURANCE COMPANY
*v.* BESSIE Z. NEIKIRK
[No. 48, April Term, 1938.]

*Decided June 29th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, MITCHELL, SHEHAN, and JOHNSON, JJ.

*William P. Lane, Jr.,* and *Joseph D. Mish,* for the appellant.

*John Wagaman* and *Charles F. Wagaman,* with whom was *J. Lloyd Harshman* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

The suit in this case is upon an accident policy issued by the Metropolitan Life Insurance Company, the appellant, insuring Carlton E. Neikirk, the husband of the appellee.

The declaration sets forth that the policy was originally issued and delivered to the insured on November 1st, 1930; that through the regular payment of renewal premiums it was in full force at the time of the death of the insured, and that under its terms and provisions, the appellant agreed, among other things, to pay to the appellee the sum of five thousand ($5,000) dollars in event the insured should lose his life as a result of bodily injury caused directly and independently of all other causes by violent and accidental means, prior to such date as the insured should reach the age of sixty-five years. Finally, it alleges that on July 4th, 1936, the insured, being at that time thirty-four years of age, did sustain bodily injuries under the circumstances above set forth, as a result of which, on said date, his death occurred. Demand for payment, after due proof of loss, having been met by a refusal of the insurer to pay the loss, suit was brought in the Circuit Court for Washington County, by the claimant, resulting in a verdict and

judgment in her favor for the sum of $5,425, which was subsequently remitted by the appellee to the sum of $5,420; and it is from that judgment that this appeal was taken.

The testimony as disclosed by the record may, with substantial accuracy, be summarized as follows: That on July 4th, 1936, the insured, being at that time thirty-four years of age, accompanied by Mary G. Zimmerman, his mother-in-law, and his five-year-old daughter, proceeded from Hagerstown, Maryland, to Blockford's Landing, a point along the Potomac River, for a holiday outing; that they arrived at the river at around 11 or 11:30 A. M., whereupon the insured started to fish along the river bank a short distance from, and out of the sight of, his companions, who were preparing lunch. Not long thereafter, while to all appearances in his usual and normal condition of health, he returned to where his companions were, procured a drink of water and returned at once to the scene of his fishing. Approximately twenty minutes later, the mother-in-law, accompanied by the child, went to a point on the river bank above where the insured had been fishing, from which they discovered his body submerged in water.

Describing the position of the body, Mrs. Zimmerman stated, that "his head was towards the edge of the water and his feet out in a sort of a slant, his feet further from the bank than his head. His head was at least three feet from the actual edge of the water. I will say the approximate depth of the water was two feet where his body was. I thought his body was resting on the bottom. He was entirely submerged."

She further testified that the body was near the end of a path leading down the bank; that the contour of the bank was very steep; that it was eight feet high; that below the bank there was a beach five or six feet in width which sloped toward the water, and that she observed no movement of the body at the time she called for help, she being afraid to descend the bank.

Jerry Greer testified that, upon being told that some one

had drowned, he immediately went to the scene; that the body had then been brought out of, and was lying on the edge of the water; that he administered artificial respiration, and that the body was then warm and he would say the insured was not then dead, although he saw no movement, whatever, in any part of the body; that he, and a young woman who came on the scene and offered her services, ministered to the deceased in their efforts to restore respiration, for thirty-five minutes, during which time he estimated that a quarter of a pint of water was pumped from the body.

Mr. Greer observed a mark on an eye of the insured, that his lip was swollen, and that his nose was bloody or that blood had flown therefrom; and he described the slope in the part of the bank adjacent to the water's edge as being at an angle of from thirty to thirty-five degrees.

Dr. Frank F. Lusby, who knew the insured, saw the body on the day of the death of Mr. Neikirk; he observed that the deceased then had an injury on the left upper eyelid, and a lacerated wound on the right side of his nose, but did not observe the injury to his lip; that the injuries described by him were accompanied by bruises; that a bruise from a blow received after death is not the same color as from one received before death, and that the bruises he saw were definitely from injuries received prior to the death of the insured; that the injured eyelid was swollen, and that a blow on a dead body does not cause swelling. That he was present at an autopsy performed on the body by Dr. Howard J. Maldeis, approximately eight weeks after the date of death, at which time the bruise on the eye and mark on the nose were still demonstrable; that in his opinion the autopsy did not show any cause for natural death. He observed at that time a blood clot in the left coronary artery, and through the rest of the blood stream a large number of blood clots; that under ordinary circumstances death does not instantly ensue from coronary thrombosis, but usually follows in two or three days, and that if the crisis is passed within that period, the more dangerous

period is reached in from fourteen to sixteen days. He added: "If a coronary thrombosis has existed for anything like that time, a man would not be able to go around and fish and go to a picnic. If it had existed from two or three days or from twelve to fourteen days, that fact would be demonstrable at an autopsy, such as was performed; that the autopsy showed no evidence that the insured died from coronary embolism; that from his observations at the autopsy there was no evidence of drowning, and in his opinion the insured did not drown; that assuming a microscopic examination by Dr. Maldeis indicated arterio-sclerosis, there was nothing at the autopsy to indicate that the insured could have died of arterio-sclerosis without the formation of a blood clot."

Dr. W. Howard Yeager testified that he examined Mr. Neikirk on January 14th, 1936, and that with the exception that he then had bad tonsils and pyorrhea, the examination showed him as being in good health. It did not demonstrate any symptom of arterio-sclerosis, and showed the superficial vessels to be perfectly normal.

Joseph Neikirk, a nephew of the insured, saw the body approximately half an hour after it was taken from the water; he watched the process of artificial respiration and noticed a small steady stream of water running from the nose. According to this witness, the deceased had a cut on his nose, a swelling over his eye, and a small cut on his lip—the mark over the eye was bruised. He observed the fishing rod of the insured lying against the river bank at a point directly at the bottom of the path.

Mrs. Bessie Neikirk, the appellee, testified that she was a registered nurse, that the general condition of her husband's health was good, and that he missed but little time from work on account of illness. When she reached the scene of his death, she found on his left eye an ugly bruise; the corner of the mouth was swollen and a deep scratch was on the nose. The indicated injuries were not normal, "they were very blue, very much discolored, they were bruises." She described the steep part of the bank as being from eight to ten feet high, surfaced with

underbrush and stones and difficult to climb; the slope of the space between the bottom of the almost perpendicular part of the bank, and the edge of the water, being at an angle of forty-five degrees.

And finally, Dr. Maldeis who, as heretofore indicated, conducted an autopsy on behalf of the appellant, testified that he performed the same on August 25th, 1936, in the presence of Dr. Lusby; that the examination showed no positive signs of drowning, and that Mr. Neikirk did not drown; that based upon both autopsy and microscopic examination findings, in his opinion the cause of the death of the insured was due to a diseased condition of the coronary artery; that the coronary disease from which the insured was suffering showed a definite narrowing, likewise it showed a clot which was probably *post mortem;* that it takes a certain amount of time for a clot in a vessel to become organized, and it is possible that there was not time for the complete organization of the clot which he found. "In other words, this death, in my opinion, was sudden; the clot was present at the time and the clot had not actually closed off the circulation to the man's heart muscle, he did not live long enough—it takes sometimes five or six hours to organize * * *. A man can die from coronary disease without a clot in the coronary artery; without any muscular changes whatever; he can drop dead from the disease itself with a moderate narrowing or with a complete narrowing * * *. From the autopsy, both gross and microscopic, I did not find any other indicated cause of death than I have described." Dr. Maldeis described wounds on the left eyelid and nose, which he observed, as not being such as would cause death. He saw nothing wrong with the mouth of the deceased; in his opinion the process of embalming would tend to cover up any discoloration which may have existed about the wounds, but it would not remove swelling, and he found no evidence of the latter. "Q. A man can die from natural causes and the cause cannot be determined by an autopsy? A. That is true."

On cross examination the doctor stated he would not say it was usual for a person like Mr. Neikirk, in the beginning of arterio-sclerosis, to die from that disease without the formation of a clot, and that while arterio-sclerosis is hereditary, it is uncommon for a man of the age of the insured, under the other conditions of the body as he found them, "to die from arterio-sclerosis, particularly so quickly without the formation of a clot."

Two exceptions are found in the record, the first relating to the inclusion therein of the testimony of the witness Jerry Greer, to which no formal exception at the time of trial appears to have been taken, and the second as to the ruling of the trial court upon the prayers; these will be disposed of in the order of their sequence.

While the first exception was not seriously pressed in this court, and it is suggested in the brief of the appellant that the question sought to be raised thereby is unimportant for the purposes of a conclusion in the instant case, it is nevertheless referred to in the briefs of each of the contending parties, and for that reason it will be discussed in this opinion.

In the course of the examination of Mr. Greer with reference to the condition of the insured at the time he first saw him, he was asked by counsel for the appellee: "Do you know of your own knowledge, or by any test you performed, can you, yourself, say, whether he was then dead or alive? A. I would say he was alive." Then follows the following excerpt from the record: "Objected to and asked to have the answer stricken out.

"Q. Will you tell the court and jury, please, what, if anything, you observed about Mr. Neikirk to indicate to you whether he was alive or dead? (Unanswered.) (By the Court) Was his body warm? A. Yes, it was. Q. Did you perform artificial respiration upon his body? A. I did."

As will be noted, the record does not disclose a ruling of the court on the aforegoing objection to the question and answer, and it is admitted by the appellant that no exception to the omission of the trial court to rule on the

objection to the question, and motion to strike out the answer, was formally made at the trial. In this state of facts, however, it is now contended by the appellant that the question and answer, to which the objection and motion applied, is not properly a part of the record, and, to its inclusion therein, exception is attempted to be raised in this court.

It seems unnecessary to dwell at length upon this question, in the face of the express mandate of section 10 of article 5 of the Code, which provides in part as follows:

"In no case shall the court of appeals decide any point or question which does not plainly appear by the record to have been tried and decided by the court below." See *Hamilton v. State,* 127 Md. 312, 96 A. 523; *Crout v. State,* 157 Md. 387, 146 A. 241.

Doubtless a ruling would have been promptly made by the learned judge who presided at the trial, had his attention been called to the omission by the objecting counsel, before the case proceeded with other questions to the witness, but regardless of this conjecture, the right to raise the question for consideration in this court was not exercised, and hence the subject sought to be presented thereby cannot be now considered.

The second exception, in so far as the same was argued in this court, relates to the action of the lower court in refusing to grant the appellant's 1 and 2 prayers, the first of which sought an instruction that under the pleadings in the case there is no evidence legally sufficient to entitle the plaintiff to recover; and the second that the jury be instructed, "that it appears from the uncontradicted evidence that the death of the deceased did not result directly and independently of all other causes, from bodily injuries sustained through violent and accidental means, and therefore, under the pleadings, their verdict must be for the defendant."

The language of the policy is clear and unambiguous, as by its express terms the insurer is liable for loss by reason of the death of the insured only upon the condition

that the death of the latter ensued from bodily injuries sustained and caused "directly and independently of all other causes by violent and accidental means".

The fact of death does not of itself create a presumption that it occurred from accident, and, in the case before us, the burden rests upon the plaintiff, in the first instance, to make out a *prima facie case* in favor of recovery, by showing that the death of the insured did occur under the circumstances set forth in the policy as a condition precedent to the liability of the insurer. 1 *C. J.* 495, sec. 278, and 1 *C. J.* 496, sec. 284.

In the last analysis, therefore, our decision must rest upon the sole question:

Whether under the peculiar facts and circumstances of the instant case, the trial court erred in refusing to grant the instructions indicated? As has been observed by its rejection of the indicated prayers, the court refused to rule, (a) that there is no evidence legally sufficient to entitle the plaintiff to recover, and (b) that it appears from the uncontradicted evidence that the death of the deceased did not result within the purview of the conditions of the policy sued on. And, therefore, for the purpose of determining the correctness *vel non* of the court's action upon the above prayers, it becomes necessary (1) briefly to analyze the testimony heretofore detailed, and (2) to apply to the facts as thus ascertained the law which controls the court in acting upon demurrer prayers.

Reverting again to the testimony, it will be recalled that the insured was but thirty-four years of age; that the testimony tends to show that he was in good health and that he was seen but twenty minutes before his body was found, at which time "he seemed just the same as always". There is evidence that he had facial injuries and bruises, and that they were received before death, because the bruises of the character found on the body were distinguishable from bruises resulting from blows after death. While the medical testimony that the insured did not die from drowning is in harmony, it is a

significant fact that one doctor testifies that the autopsy did not show any cause for natural death, while on the other hand another medical witness testified that the same autopsy showed that death was due to a diseased condition of the coronary artery, and that a man can die from natural causes and the cause not be determinable by an autopsy.

Obviously the purpose of accident insurance is to protect the insured against accidents that occur while he is pursuing his business or pleasure, in the usual way, without any thought of being injured or killed, and when there is no probability, in the ordinary course of events, that he will suffer injury or death. Such injury or death, as in the instant case, may occur when there is no eye witness to the tragedy, and while, as we have seen, the burden is upon the claimant under the policy to establish a *prima facie* case, he can do no more than that under such circumstances, and it remains for an autopsy to determine the result of death from causes other than accident, if such can be determined by an autopsy. Does the autopsy in the case now under consideration establish a result which would warrant a court in ruling, as a matter of law, that the insured did not die as a result of injuries covered by the policy? We conclude that it does not.

In this connection it should be borne in mind that the autopsy was not performed until over seven weeks after the date of death; that the body had been embalmed, and that the process of embalming was that of draining the blood vessels of the body of their natural contents, and flushing them with foreign fluid. At best, it would appear to be mere conjecture to assume that no changes, through natural causes, took place in the blood stream of the deceased, under such circumstances, during a period which ordinarily is the warmest season of the year; and it must be remembered that the testimony found in the record is not such as to remove all doubt that the indicated factors had not worked changes in the dead body, prior to the delayed autopsy. There is no evi-

dence that the deceased, in his lifetime, suffered from any organic trouble. He was thoroughly examined less than six months before his death, by a doctor who testified that his superficial vessels were perfectly normal; his wife, a registered nurse who saw him daily, testified that his health was good down to the date of his death, and the record does not show that he ever suffered from organic disease of any kind.

In the case of *Standard Acc. & Life Ins. Co. v. Wood*, 116 Md. 575, 82 A. 702, the suit was upon an accident policy covering, among other things, death by accident, under practically the same conditions as those embraced in the policy found in the record. The deceased suffered from injuries received by accident to the extent of a broken leg; his death occurred two weeks later, and the defense was that the insured died from natural causes, there being testimony to the effect that an autopsy showed that he had advanced arterio-sclerosis. There, as here, there was conflict in the medical testimony adduced by the respective parties, and the first and second of a number of demurrer prayers, offered by the defendant in the case, were in the exact form of the two prayers now under consideration.

In passing upon all of the demurrer prayers, and in affirming their rejection by the lower court, this court said (page 705) : "The first prayer cannot be granted if there is any evidence, however slight, tending to show that the death was due solely to the accident, and none of the others can be granted, unless the evidence referred to therein was in fact absolutely uncontradicted."

As has been intimated, we are not unmindful that the burden was upon the appellee to establish the accidental death of the insured in accordance with the terms of the contract. To meet that burden it was incumbent upon her to establish a *prima facie* case, and in view of the testimony she did produce, as supported by the physical facts connected with, and the circumstances surrounding, the death of the insured, we are unwilling to hold, as a matter of law, that there was error in the submission

of the case to the jury. 2 *Poe's Pl. & Pr.*, sec. 295; *Baltimore Elevator Co. v. Neal,* 65 Md. 438, 5 A. 338; *Universal Credit Co. v. Merryman,* 173 Md. 256, 195 A. 689.

*Judgement affirmed, with costs.*