JENNIE MAY GOHLINGHORST *v.* METROPOLITAN LIFE INSURANCE COMPANY.

[No. 31, October Term, 1939.]

*Decided November 1st, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Anthony Purcell* and *Paul Berman,* with whom were *Theodore B. Berman* and *Levin & Hendelberger* on the brief, for the appellant.

*Michael J. Manley,* with whom was *W. Hall Harris, Jr.,* on the brief, for the appellee.

JOHNSON, J., delivered the opinion of the Court.

The single question presented by this appeal is whether the trial court correctly instructed the jury that the evidence was legally insufficient to show that the death of Mary A. Packham was caused by bodily injuries sustained solely through external, violent, and accidental means, resulting directly and independently of all other causes.

Mrs. Packham, the decedent, was insured by appellee under two identical policies, save for the amounts payable in event of her death, in each of which appellant, her stepdaughter, was the beneficiary. The policies contained provisions that if the insured, after attaining the age of fifteen and before attaining seventy, sustained during the life of the policies "bodily injuries solely through external, violent and accidental means, resulting directly and independently of all other causes in the death of the insured within ninety days from the date of such bodily injuries," while the policies were in force and premiums not in default beyond the grace period specified therein, appellee would pay, in addition to the face amount of the policies, an accidental death benefit equal thereto, unless such bodily injuries were sustained by the insured in certain excepted employments and occupations. It was further provided that "no accidental death benefit will be paid if the death of the insured is the result of self-destruction, whether sane or insane, nor if death is caused or contributed to, directly or indirectly, or wholly or partially, by disease, or by bodily or mental infirmity, nor if death results from bodily injuries sustained while participating in aviation or aeronautics, or while the insured is in military or naval service in time of war."

At the time of her death, on May 22nd, 1938, Mrs. Packham was fifty-five years of age, and it is admitted that premiums upon the policies were not in arrears, further that appellee has paid unto appellant the face amount of the policies, refusing, however, to pay accidental death benefits. The decedent, her husband, who

departed this life prior to the trial in this case, her step-daughter, Jennie May Gohlinghorst, and the husband of the latter, lived in the same building, the Packhams in an apartment upon the second floor, and the Gohlinghorsts in a first-floor apartment. Mr. and Mrs. Packham slept in the same bedroom, but in separate beds.

On the evening of May 21st, 1938, when last seen by Mrs. Mohlinghorst, the insured was eating ice cream upon the premises of the stepdaughter, and was apparently in good health. Shortly thereafter she retired to her bedroom upon the upper floor, undressed, and retired. On the following morning, which was Sunday, the step-daughter awoke about eight o'clock, and, approximately three hours later, called up the steps to the parents, but received no reply from either of them, except that her father coughed, which was a usual thing for him to do when any one had called. She went upstairs, raised the blinds and discovered decedent on the mattress, lying upon her stomach without any pillow. Her head was wedged between the mattress and a horizontal iron bar that connected the head posts of the bed, the bar being four or five inches above the mattress, which was soft and rested upon a new coil spring. Assured was dead and her flesh was "the color of an egg plant." Immediately Doctor Tonry was summoned, and, upon his arrival, Mrs. Packham's body was with some difficulty extricated from the position in which it was found "well wedged" beneath the bar. The physician considered it a coroner's case, and notified Doctor John A. Evans, the coroner of that district, who arrived upon the premises at 12:30 or 1:00 on the same day. After observing Mrs. Packham's body and conversing with those present, he gave a certificate, the effect of which was that strangulation was the immediate cause of death, but this was induced by an epileptic seizure. Doctor Evans, who also testified at the trial, stated that her face was blue when he arrived and death was due to strangulation, but, upon being told by some of those present that decedent was subject to epilepsy, he concluded she

had suffered an epileptic seizure, and in that state forced her head beneath the cross-bar, causing strangulation. Doctor Tonry testified that to determine the exact cause of death would require an autopsy, but strangulation would cause the discoloration of Mrs. Packham and he believed did cause it; that he recalled having treated her on May 5th or 12th for a cut on the wrist, and her telling him she had had an epileptic fit and cut her arm. He further stated that when he arrived Mrs. Packham had been dead "two or three hours, it may have been longer," because *rigor mortis* had set in. It is conceded in briefs and oral argument that Mrs. Packham's death was in fact caused by strangulation.

Additional testimony of Mrs. Gohlinghorst was that she did not see her stepmother after she had retired on Saturday evening until she found her dead Sunday morning, but that the stepmother had lived with her four and one-half years and her epileptic attacks were four months apart, her last attack having occurred around the middle of May, at which time she was treated for a cut; that when she had an epileptic fit "her eyes got glossy and she would make a terrible noise; you could hear her all over and she foamed at the mouth"; that at times, when the windows were up, she could be heard by the neighbors next door, but the witness heard no noise on the night of May 21st, or on the following morning, when she found her dead.

The aforegoing is a summary of the testimony before the trial court, and it will be observed that there is no direct testimony that at the time of, or immediately preceding her death, Mrs. Packham suffered from an epileptic seizure, nor is there circumstantial evidence to point thereto, unless it be assumed that, because in the past she had been subject to such attacks, she suffered from one upon this occasion, and during the attack forced her head beneath the bar and caused strangulation.

At the close of the plaintiff's case the trial court granted a prayer offered by the defendant, which was in

effect a demurrer to the evidence. It being settled that such a prayer cannot be granted if there is any evidence, however slight, which is competent and pertinent to support the plaintiff's right to recover (2 *Poe, Pl. & Pr.,* sec. 295; *Baltimore Elevator Co. v. Neal,* 65 Md. 438, 5 A. 338; *Merrifield v. Hoffberger Co.,* 147 Md. 134, 127 A. 500; *Barker v. Whittier,* 166 Md. 33, 170 A. 578; *Universal Credit Co. v. Merryman,* 173 Md. 256, 195 A. 689; *Metropolitan Life Ins. Co. v. Neikirk,* 175 Md. 163, 200 A. 370), was the trial court correct in deciding that issue in the negative?

It may be conceded that if decedent, during an epileptic attack, forced her head beneath the horizontal bar and caused strangulation, her death would have been contributed to by bodily or mental infirmity within the excepted terms of the policy, thereby disentitling appellant to recover, and appellee urges that this has been clearly shown. It further invokes the doctrine that because the evidence tends equally to sustain either of two inconsistent propositions, one that death was caused entirely by an accident, the other that it was caused by bodily infirmity or disease, there can be no recovery, and cites the case of *County Commissioners of Harford County v. Wise,* 75 Md. 38, 23 A. 65. As a legal proposition that principle cannot be disputed, but it has no application here, where admittedly the cause of death was strangulation. The cause of the death, therefore, being known, the inquiry resolves itself into whether the strangulation was induced by bodily infirmity or disease.

In *Metropolitan Life Ins. Co. v. Neikirk, supra,* we were considering the provisions of a policy of accidental insurance quite similar to the one now before us, since it insured against death from bodily injuries caused by violent and accidental means. Insured's body was found submerged in shallow water near the foot of a steep declivity. The question there was whether death had been caused solely by violent and accidental means. As in this case, there were no eyewitnesses to the occurrence, nor was there a *post-mortem* immediately after death.

It was held that the fact of death did not of itself create an assumption that it occurred from accident, but the burden rested upon the plaintiff, in the first instance, to make out a *prima facie* case in favor of recovery, by showing that insured's death did occur under the circumstances set forth in the policy as a condition precedent to the liability of the insurer. There was testimony that insured was in good health shortly before his body was found, and that he had facial injuries and bruises which he must have received prior to death. The medical testimony was to the effect that he did not die from drowning, and further medical testimony showed that death was due to a diseased condition of the coronary artery, but it was admitted that a man could die from natural causes not determinable by an autopsy, which in that case had not been performed until seven weeks after death. We held that the trial court acted correctly in submitting the case to the jury, and affirmed the judgment appealed from.

Giving full effect to the testimony of Mrs. Gohlinghorst that Mrs. Packham's epileptic seizures occurred at intervals of four months, that she had such a seizure about the middle of May or, according to the recollection of Doctor Tonry, a few days earlier; further that death was caused by strangulation, itself an unnatural cause, plus the fact that she was in good health upon retiring on May 21st, and, when her body was viewed by Doctor Tonry around eleven o'clock on the following morning, she had been dead two or three hours, possibly longer, that had she had an epileptic attack within three hours, Mrs. Gohlinghorst, who had been away during the period, would, in view of the testimony as to the effects of such an attack upon her, in all probability have heard her, we are of the opinion that it cannot be properly held that a rationally minded person could not have concluded upon the evidence adduced that her death was caused by external, violent, and accidental means entirely disassociated from bodily affliction or infirmities, for it is con-

ceivable that insured, who was a heavy woman, and in good health and not suffering from an epileptic attack, could, while sleeping upon the mattress with the new coil spring, lying upon her stomach and using no pillow, in some accidental manner have gotten her head wedged between the mattress and the iron bar, causing strangulation. Then, too, the medical testimony is entirely consistent with such a conclusion. Strangulation is known to have been the cause of insured's death, but the evidence that her bodily affliction, to wit, epilepsy, contributed to the strangulation, is not so certainly and satisfactorily shown as to warrant the court in holding as a matter of law that it actually so contributed.

The judgment appealed from must, therefore, be reversed, and the case remanded for a new trial, in order that a jury may be permitted to perform its function of deciding under proper instructions whether insured's death was caused by violent, external, and accidental means, not contributed to by bodily disease or affliction.

*Judgment reversed, with costs, and a new trial awarded.*

Bond, C. J., filed a dissenting opinion as follows:

Passing by any other arguments, I think the ruling of the trial court was right because only one of the fits of the insured could account for forcing her head through under the bar of the bedstead, in a space not wide enough for the neck, and allowing it to stay there until she was strangled.